**ALCOTT COMPANY, Inc., Appellant,**

v.

**E. J. RAPHAEL, Trustee in Bankruptcy of J. P. Shepherd Lumber Company, Inc., Appellee.**

No. 17938.

United States Court of Appeals
Fifth Circuit.

March 8, 1960.

**552**

Philip Mansour, Greenville, Miss., for appellant.

W. C. Keady, R. T. Love, Greenville, Miss., for appellee.

Before RIVES, Chief Judge, and HUTCHESON and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal from a judgment in favor of a trustee in bankruptcy setting aside a conveyance of real estate by the bankrupt corporation to appellant, its stockholder, under the provisions of Section 70, sub. e of the Bankruptcy Act.[1]

■ In determining whether there was a voidable conveyance which the trustee may set aside, we must look to the state law, Gonterman v. Nicholas, 5 Cir., 270 F.2d 509. See 4 Collier, Bankruptcy, 14th ed., p. 1352.

The Mississippi Statutes, which the trustee relies on as the basis for his attack on the transfer are:

Section 5328, Mississippi Code of 1942:

"No part of the capital stock in any corporation shall be withdrawn or diverted from its purpose, nor a dividend declared, when the company is insolvent, or would be rendered insolvent by such withdrawal on the payment of such dividend; and the directors who assented to such withdrawal, or declared and paid such dividend, as well as the stockholders who received it, shall be jointly and severally liable to creditors whose debts then existed, to the extent of such withdrawal or dividend and interest."

Section 5311, Mississippi Code of 1942:

"No outstanding stock of any corporation shall be retired if the corporation would be thereby rendered insolvent or its paid in capital be thereby reduced to less than the minimum amount required by its charter or amendments thereto, except upon dissolution."

The basis of the trustee's attack is thus set out before reciting the facts of the case because it at once becomes apparent that there must be proof of insolvency of the corporation following, and as a result of, the transfer in order for the trustee to prevail.

■ The appellant here attacks the conclusion of the trial court on the dual ground that the test of insolvency used by the court was erroneous and that, even under the correct test, the finding of insolvency is without any evidence to support it.

■ Stating the facts most strongly in favor of the appellee, as we must on an appeal from a finding of facts, the record discloses that the trial court would be warranted in finding, as it did:

(1) J. P. Shepherd Lumber Company was incorporated in January, 1955, with authorized capital stock of $20,000 consisting of 200 shares of common stock of a par value of $100 per share. The charter required 10 shares to be subscribed and paid for before the corporation was authorized to commence business. This corporation succeeded to the business previously operated under the same name by J. P. Shepherd and Harry W. Alcott as partners. The charter was amended in September, 1955, to increase the authorized capital stock to $70,000 consisting of 700 shares of common stock of a par value of $100 per share. That

1. The provisions, codified in 11 U.S.C.A. § 110, sub. e (1) and (3), are:

"(e) (1) A transfer made or suffered or obligation incurred by a debtor adjudged a bankrupt under this title which, under any Federal or State law applicable thereto, is fraudulent as against or voidable for any other reason by any creditor of the debtor, having a claim provable under this title, shall be null and void as against the trustee of such debtor.

\* \* \* \* \*

"(3) For the purpose of such recovery or of the avoidance of such transfer or obligation, where plenary proceedings are necessary, any State court which would have had jurisdiction if bankruptcy had not intervened and any court of bankruptcy shall have concurrent jurisdiction."

year J. P. Shepherd and his wife subscribed and paid for 280 shares and Harry W. Alcott and the members of his family subscribed and paid for 200 shares. Shepherd was President of the corporation and directed its business operations. Alcott was Secretary from the organization of the corporation until at least August 15, 1956, and at all times was spokesman and agent for the other stockholders in his family.

(2) The principal business of this corporation was contracting for the construction of residences and other buildings, but it also sold building materials at retail.

(3) In September, 1955, the corporation acquired for $28,000 cash a 55 acre tract of land intended for residential development, which was called "Cherokee Gardens." This purchase gave rise to the increase in authorized stock and the increase of paid in capital to $48,000. After this purchase, the corporation sold buildings located on this land for a net of $1,278.95, thus leaving the cost of this property at $26,721.05, which was the figure carried on the corporate records as the cost of this property and entered on its tax return for the fiscal year ending January 31, 1956.

(4) In computing its operating loss for the fiscal year 1955, ending January 31, 1956, the corporation accounted for real estate owned costing $37,613.98. Its operating statement for the fiscal year showed a deficit of $316.26 charged against paid in capital which was shown at $48,000.00

(5) On September 27, 1955, Harry W. Alcott paid $4,000 to J. P. Shepherd Lumber Company, showing thereon that it was in payment for 3 acres of the Cherokee Gardens tract on which the Pehl house was located. Both Alcott and Shepherd testified that Alcott was to have this tract as his individual property. However, this claim cannot be reconciled with the aforementioned corporate records with respect to the net cost of the Cherokee Gardens property nor with the various financial statements issued by the corporation. On most, if not all, of these records and statements, the cost of the Cherokee Gardens property was shown as aforementioned. Record title to all of the Cherokee Gardens property remained in the corporation until August 15, 1956, and no deed was executed to Harry W. Alcott, individually, for any part of this property. The weight of the evidence indicates that, after the purchase of this property, it was decided that Alcott would apply this payment toward the purchase of stock.

(6) The corporation's basic books consisted of a cash journal and a general ledger. No accounts payable ledger was kept, but trade and other invoices were loosely kept in a file folder. There was an accounts receivable ledger in which charges to customers were posted irregularly. From time to time, the accounts receivable would be adjusted by the corporation's bookkeeper to reflect estimates of work completed on the various construction jobs. A physical inventory was taken only at the end of the fiscal year which closed with January 31.

(7) During the life of the now bankrupt corporation, Alcott was President and a stockholder of Mill Supplies, Incorporated, another corporation, which sold industrial supplies to customers. He is an intelligent businessman, conversant with inventories, accounts receivable and trade accounts payable. He knows how to read a balance sheet and determine the net worth of a company. Shepherd was a builder, and, apparently, had small business experience other than his efforts to direct the bankrupt's business, which were characterized by poor estimates, poor bidding on contracts, excessive cost in construction and consistent loss of money in the bankrupt's operations.

(8) It is apparent that there was a very substantial operating loss to the corporation from February 1, 1956, to June 30, 1956. The size of that loss would depend, in large measure, upon the value of the merchandise inventory at the latter date. This actual merchandise inventory is not known. The only rec-

ords available in that regard consist of two slips of paper, located in the working papers of an accountant, upon which figures purporting to be merchandise inventory at June 30, 1956, were written. It is not shown who prepared these two slips of paper, and, hence, it cannot be known whether either of them have any validity or not. Considering the lower figure of slightly more than $8,000 (the figure more in line with the financial history of the bankrupt corporation's operations) the operating loss for the five month period would have been $20,132.-95, averaging more than $4,000 per month for that period.

(9) Alcott and Shepherd had an informal understanding in about May of 1956, which contemplated that, for certain considerations, the investment real estate of the corporation, carried at a cost of $37,613.98 would be conveyed to The Alcott Company, Incorporated, a corporation organized by Alcott for himself and family for the express purpose of receiving title to this real estate. Alcott was the President and dominant figure in that new enterprise. In their informal discussions, it was assumed that Alcott would surrender to the corporation 200 shares of stock owned by him and the members of his family.

Although not so found by the court, the evidence showed without dispute that the agreement also called for the payment of $10,848.26 cash, the assumption of certain debts and the giving of a $5,-000 note. Considering the stock to be worth par, which is the amount Alcott paid for it less than a year previously, the total thus paid for the land would equal its value.

Neither Alcott nor Shepherd requested the corporation bookkeeper to prepare a financial statement showing the then current financial condition of the corporation. No physical inventory was taken by Shepherd or the corporate officers. No effort was made to determine the amount of accounts payable then owing by the corporation. Alcott testified that he knew the capital was unimpaired (except for $316.26) at February 1st and he assumed the company was in about the same condition in May. No resolution was adopted by the stockholders and officers of the corporation ratifying or recognizing the informal understanding between Alcott and Shepherd until June 1, 1957. Instead, Alcott paid to the corporation certain sums which were credited on the corporate records to the cost of the Cherokee Gardens property. These sums and the dates upon which payments were made are as follows: $5,000 on May 16, 1956; $3,000 on June 12, 1956; $2,-000 on June 29, 1956; $848.26 on August 16, 1956 for a total of $10,848.26. On August 15, 1956 the bankrupt deeded to The Alcott Company, Incorporated, the Cherokee Gardens property reciting that the consideration was the transfer of 200 shares of stock by the Alcotts to the wife of J. P. Shepherd. A companion deed was executed by Alcott and Shepherd on the same date conveying to The Alcott Company, Incorporated, two lots in Mattingly-Frazier Addition and the two remaining lots in Woodlawn Addition (one had been sold on June 20, 1956, by the corporation for $1905), which property admittedly the grantors were holding as trustees for the corporation. The 200 shares of stock held by the Alcotts were turned in to the corporation for retirement and cancellation. In addition a note for $5,000 was given by The Alcott Company, Incorporated, maturing five years after November 1, 1956. The date of execution of this note was shown on the face thereof as November 1, 1956. The real estate transaction was entered on the corporate books by its bookkeeper in late September, 1956, at which time entries were made showing that 200 shares of stock had been retired by the corporation. Upon its retirement the Alcott stock was dealt with at par, namely $20,000.

(10) The corporation's bookkeeper, although it is not clear who requested him to do so, began efforts to determine the condition of the corporation as of June 30, 1956, but this work was not completed until after fruition of the aforementioned transaction.

(11) In addition to the payments made directly to the corporation and the retirement of the Alcott stock, Alcott and The Alcott Company, Incorporated, as a part of the real estate transactions in question, paid $2498.06 indebtedness owed by the bankrupt corporation.

Further findings of the court attacked by appellant are: Even by conservative and conventional accounting methods, ordinarily used for business purposes, the corporation was obviously insolvent after the transaction of August 15, 1956, at which time conventional liabilities exceeded conventional assets by more than $6,000.00.

A further significant fact is that the company did not go into bankruptcy for some 18 months after the transfer in question.

The court found that since the transfer rendered the corporation insolvent,[2] the appellant must reconvey the property upon his being repaid the amount of cash paid or advanced by him.

We conclude that there was no basis in the record to warrant such a finding of insolvency by the court. It is readily seen that the court erred to the extent of $5,000 of assets by its treatment of the $5,000 note given by Alcott on the purchase price for the land. Although the trial court disregarded this note as an asset in finding the balance between assets and liabilities following the transfer, it gave credit of $5,000 to Alcott for the face amount of the note in making its final judgment against Alcott.[3]

If the court had given effect to the note as an asset immediately following the transfer, as it should have, this would have left the corporation insolvent according to the trial court's finding and on appellee's computation, only to the extent of $1,231.64.

In order to arrive at the true figure of assets and liabilities as of May 15, 1956,[4] all the accounting witnesses agreed, as of course they must, that it was necessary to ascertain in some way the value of cash, inventories and accounts receivable on the asset side, and accounts, payable, notes payable and loans payable on the liability side. There was no disagreement as to the liabilities. There was a substantial dispute as to the assets.

No current inventory account was kept. Inventory was entered on the books only at the close of each year's operation.

The trustee sought to establish the inventory figure as of August 31st.[5] His witness, by pure speculation, concluded that the inventory was $5,021.70 on the following reasoning: On January 31, 1956, the date of the last financial statement before the transfer in May, the company had a merchandise inventory of $4,400. It then owed $7,359.09 for merchandise to creditors. On January 31, 1957, the date of the next annual statement, the corporation owed $21,414.11 against a merchandise inventory of $10,-966.57. Appellee blandly states that "a ratio of approximately $2.00 was owing on each $1.00 of inventory throughout the year." Then, stating that there was an undisputed figure of $10,043.41 due to merchandise creditors as of June 30,

2. Although the trial court referred to insolvency in terms of not being "able to pay its debts in the ordinary course of business from its own resources or by a legitimate use of its own corporate credit," an incorrect measure of solvency, it did nevertheless find as a fact that liabilities exceeded assets by more than $6,-000 following the transfer. It is this finding that is under attack.

3. The court found there was no actual, but only constructive fraud, and decreed a reconveyance of the real estate upon re-payment to Alcott of the cash he had paid, including the $5,000 note as cash.

4. This is the date on which the agreement to transfer the real estate was made, and $5,000 cash towards the purchase price was paid by Alcott on that day.

5. The witness took this date as being the closest to August 15th, the date the deeds were signed. In point of fact the critical date is May 15th, at which time the agreement to transfer the real estate was sealed by payment of $5,000 cash to the corporation.

1956, (this is 60 days away from the August 31st date to which appellant seeks to apply it), appellant says:

"Applying the two-to-one ratio mentioned above, there results an inventory of $5,021.70."

This is the figure accepted by the court in its finding that the company's conventional liabilities exceeded conventional assets by more than $6,000.

Not only is it a complete non sequitur to say that because there was a two-to-one ratio of debts for merchandise on January 31, 1956, and January 31, 1957, that ratio remained constant throughout the year, but even more significant is the tortured mathematics used. $7,359.09 does not bear the relation of ten-to-five to $4,400.00. It bears the relation of almost exactly ten-to-six. If we apply this ratio to the known trade liabilities as of June 30th, the inventory would be increased by $1,034.47 to $6,056.17.

This comment is made not to show that the trial court must have been wrong because there is a correct mathematical formula by which either May or August inventories could be determined, but simply to demonstrate how fallacious is the whole process of speculating on the amount of the inventory by such an assumption in order to ascertain whether there was insolvency.

It should be noted further that there is a serious inconsistency in the findings of the court in regard to this inventory matter. Discussing the amount of inventory claimed by the appellant's witnesses, the court said:

"Considering the lower figure of slightly more than $8,000 (the figure more in line with the financial his-

tory of the bankrupt corporation's operations) the operating loss for the five month period would have been $20,132.95, averaging more than $4,000 per month for that period."[6]

But, though here the court used the $8,000 inventory figure to make the computation of average monthly losses, and thus must have found it to be correct, the court made its finding as to excess of liabilities over assets on a figure of a $5,021.70 inventory.[7] Obviously, if the $8,000 had been used, the company would have been solvent to the extent of approximately $2750 when we add to the balance sheet the $5,000 note previously discussed.

The clearest indication, however, as to the incorrectness of the court's basing any finding as to solvency on the computations made by appellee's witness is that different dates were used to obtain the amount of accounts payable on which to apply the two-to-one formula for computing inventory on the one hand and to obtain the item of accounts receivable on the other. The schedule used showed accounts receivable of $16,834. This was the figure on August 31. But in computing the inventory by application of the two-to-one formula it used the accounts payable figure for June 30. If the June 30 date had also been used for ascertaining the accounts receivable the evidence is uncontradicted that it would have been $23,764.76, or nearly $7,000 more on the asset side of the balance sheet. In short the witness computed the value of the inventory at June 30, at which time there were accounts receivable of $23,764.76, but he included in his schedule an item of accounts

6. For some reason the court thus computed it up to July 31, rather than up to May 15, the significant date. When we are dealing, as we are now, with a question of solvency depending on a few hundred dollars either way, this additional month and a half of average losses (if this computation means anything at all) would clearly make the difference between solvency and insolvency.

7. The court did not make a specific finding as to the exact amount of liabilities and assets, but it did state the excess to be "more than $6,000." The only basis for this finding was appellee's exhibit as modified by his witness' testimony asserting an excess of liabilities over assets of $6,231.64. This exhibit included the inventory figure of $5,021.70. We must, therefore, conclude that this was the figure accepted by the court.

receivable for August 31 which was $16,834. If August 31 was the correct date, then there is no evidence as to inventories on that date, because no computation was made, and we do not have even the basis for a computation on the two-to-one formula because there is no evidence as to the merchandise accounts payable on August 31.

■ An additional important circumstance which should have caused the trial court to view the efforts to estimate whether the corporation was solvent in May or August, 1956, is the value which the parties themselves, dealing at arm's length, placed on the property and the assets of the company. Here we do not have a dealing by a sole stockholder with the assets of his own corporation such as was present in McCaffrey v. Elliott, 5 Cir., 47 F.2d 72, and in Gonterman v. Nicholas, 5 Cir., 270 F.2d 509, 513, or a conflict of interests between a managing officer who acted to his own advantage to the detriment of the corporation, as in the Mississippi case of Knox Glass Bottle Co. v. Underwood, 228 Miss. 699, 89 So.2d 799, 91 So.2d 843, cited by appellee. There is no evidence whatever that the parties did not both think that the trade was a mutually advantageous one for the corporation and minority stockholder. All the affirmative proof was to that effect. Both Shepherd and Alcott so testified as did the company's accountant. Thus, in the absence of anything pointing to bad faith there was no burden on the transferor to make affirmative proof of solvency. The burden was on the party attacking it. We are here dealing with a Mississippi statute which, by clearest implication, permits a corporation to retire its stock at will unless in the process it renders the corporation insolvent. It follows that where a particular transaction working a retirement of capital stock is attacked, the burden is on the moving party to show insolvency. Cf. Holmes Brothers v. Ferguson-McKinney Dry Goods Co., 86 Miss. 782, 39 So. 70. Ratcliff v. Clendenin, 8 Cir., 232 F. 61.

■ Moreover, the proof of solvency here tendered by the appellee himself: financial statement for 1956 and 1957, income tax returns with sworn financial statements for 1956 and 1957, together with testimony of the company's accountant, made out a prima facie case of solvency both at May 15 and at August 15, 1956. No relevant proof was received that in any way rebutted it. The opinion of an accounting witness, based on book entries made on January 31, 1956, and January 31, 1957, which he admitted would not enable him to ascertain the assets in August, 1956, was no better than the facts on which it was based. International Paper Co. v. United States, 5 Cir., 227 F.2d 201, 205. The fact was that there was no proof of inventory of less than $8,000 on either May 15 or August 31. This rendered the company solvent at that time, and defeats the trustee's case.

Finding, as we do, that there was no proof of insolvency, which is required under the Mississippi statute, it is unnecessary for us to pass on the question whether any creditors who were not such creditors at the time of the transfer can be heard to complain of the transfer.

Appellant complains that the sum of $4,000 was paid by him to the corporation for a part of the tract of land bought for $28,000 and that he has a claim against the corporation for that sum of money, since he did not receive the land until he later bought it all. This would give rise to a claim as an ordinary creditor for $4,000. We agree with the trial court that the entire course of conduct between Alcott and the company supports a finding that he intended this payment to be used as an additional payment for stock. If this were not the case, there would exist an additional liability on behalf of the corporation after the transfer, which would again bring into question the solvency of the company.

The judgment of the trial court is reversed and the case remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.