**James E. MALEY, Trustee in Bankruptcy of Dutch Oven Bakeries, Inc., Bankrupt, Appellant,**

v.

**W. E. CARROLL, Appellee.**

No. 23472.

United States Court of Appeals
Fifth Circuit.

July 31, 1967.

Morris W. Macey, Samuel J. Zusmann, Jr., for appellant.

Nolan B. Harmon, Atlanta, Ga., for amicus curiae, National Acceptance Co. of America.

John L. Westmoreland, Jr., Lynwood A. Maddox, Marie Leachman, Atlanta, Ga., for appellee.

Before BROWN, Chief Judge, and GOLDBERG and AINSWORTH, Circuit Judges.

GOLDBERG, Circuit Judge:

This case arises out of an attempt—blocked by the district court, whom we affirm—of the trustee in bankruptcy to attack the ordinary sale of a going business by its owner to a new corporation. The trustee seeks to besmirch the sale, four years after it took place, with weightless assumptions and paper-weight conclusions, to "avoid" it under § 70e of the Bankruptcy Act, and to reap the price paid to the former owner for the benefit of the new corporation's creditors now that the new corporation has bankrupted itself. Section 70e may vest the trustee with a roving commission to seek out and attack void or voidable transactions, but his attacks must be triggered by genuine and not artificial illegality. Here the transaction in question easily withstands the attack.

For almost fifteen years W. E. Carroll was the sole stockholder in his successful, personally-run enterprise, the Carroll Baking Company (Baking Company). Carroll wished to sell this business and retire. In August, 1961, Carroll agreed to sell his stock for $1,000,000 to his two lawyers, Clarence Calhoun, Jr., and Walter Calhoun, and his accountant, Gwyn Jordan. The transaction was carried out in the following fashion. The Calhouns and Jordan formed Dutch Oven Bakeries, Inc., (Dutch Oven) in August. They contributed $51,000, of which $50,010 was treated as paid-in capital and $990 as surplus. They also became Dutch Oven's officers and directors.

Then, on September 15, 1961, the following transactions took place to consummate the deal: (1) Carroll transferred all of his Baking Company stock to Dutch Oven in return for $50,000 cash from Dutch Oven and six notes made by Dutch Oven aggregating $950,000, to be paid over a 20-year period, (2) Dutch Oven, now holding all of the Baking Company stock, dissolved Baking Company and distributed its assets to Dutch Oven, which also assumed Baking Company's liabilities, and (3) Dutch Oven gave mortgages on all of the old Baking Company assets (both realty and personalty) to Carroll to secure the $950,000 in notes.

The uncontradicted testimony of the accountant employed by the trustee in bankruptcy was that the closing balance sheet of Baking Company showed assets of $1,100,555, liabilities of $517,955, and a surplus of $500,498. The opening statement of Dutch Oven showed the Baking Company assets revalued upwards to $1,536,858, liabilities of $1,485,858 (equalling the Baking Company liabilities plus the notes to Carroll) and a paid-in surplus of $990. No evidence in the record tends to show that the surpluses shown by these statements did not exist. There is, further, no evidence that the adjustment of asset values (which included a writeup of land values and a new entry of an "intangible asset") was unjustified, false, fictitious, or factitious.

Carroll was never a shareholder, officer, or director of Dutch Oven, and never took part in its affairs.[1] Dutch Oven did not prosper as had its predecessor, and its balance sheets showed in-

---

1. Clarence Calhoun, Jr. testified:
"* * * Mr. Carroll had no voice in the decision to liquidate Carroll Baking Company, Incorporated. Rather, the fact of it is his agreement to accept the security instruments representing conveyance of the real property and certain personal property which was then owned by Dutch Oven, Inc., as a result of the liquidation of Carroll Baking Company, Inc., was an accommodation to Dutch Oven because we saw no point, as I said before, in having two corporations, one an operating company and one a holding company, which would have been the position of Dutch Oven Bakeries, Inc., had we not liquidated Carroll and taken over its assets. And obviously Mr. Carroll, at the time that was done, had no voice in the control of Carroll Baking Company, Inc. It was in Dutch Oven Bakeries only."

creasing deficits[2] reaching $249,213 in August, 1964. During this period payments were made to Carroll on the notes. Excluding the cash paid Carroll at the outset, a total of $217,801.60 had been paid him on the notes by September 5, 1964.

On September 25, Dutch Oven filed a petition under Chapter XI of the Bankruptcy Act, 11 U.S.C.A. § 701 et seq. On November 30, the corporation was adjudicated a bankrupt.

On December 16, Carroll filed a reclamation petition for all of Dutch Oven's real property and substantially all of its equipment. The petition alleged a balance due on the secured notes of $878,834.33.

The trustee objected, seeking disallowance of the claim or subordination of it to the claims of all other creditors. The trustee also sought judgment against Carroll for the $217,801.60 already paid to him by Dutch Oven on the notes, claiming that the sale of Carroll's stock was a sham and that the transaction in substance was a device to evade the Georgia statutory prohibition against redeeming stock except from surplus.

The referee denied the reclamation petition, and declared the security interests invalid. He granted judgment for the trustee against Carroll in the sum of $217,801.60, plus interest, and subordinated Carroll's claim to those of all other parties.[3]

The district court granted Carroll's petition for review, remanded the matter to the referee for the granting of the reclamation petition, and ordered that Carroll be allowed to share pro rata with unsecured creditors as to any deficiency in his claim.

The trustee's argument is that under Georgia law either (1) a creditor of Baking Company existing at the time of the sale to Dutch Oven or (2) a creditor of the insolvent Dutch Oven existing at the time of payments to Carroll on the notes, could have voided such sale or payments. Therefore, the trustee continues, under § 70e of the Bankruptcy Act, 11 U.S.C.A. § 110e, the trustee may stand in such a creditor's shoes and sue for "[a]ll property of the debtor affected by any such transfer." The trustee concludes that he may therefore not only defeat the reclamation petition but may also retrieve all of the payments made to Carroll on the notes. The record, however, fails to support the trustee's claim that a creditor would have been able successfully to attach the transaction under Georgia law.

▇ The trustee argues that Carroll wished to redeem his stock in Baking Company, but that he could not do so because Baking Company would have been rendered insolvent upon such redemption, and Ga.Code 22–1828(d)[4]

---

2. On August 29, 1962, the deficit was $108,750; on August 28, 1963, it was $242,078; on June 13, 1964, it was $208,460; on August 8, 1964, it was $249,213.

3. At a public sale conducted by the trustee the total bids for the property claimed by Carroll amounted to $383,283. Carroll objected to the sale and the referee did not confirm.

4. "22–1828. Other powers.—Subject to such limitation, if any, as may be contained in its charter or any amendment thereto, every corporation shall have the following powers:

\* \* \* \* \*

(d) Buy and sell its own stock. To purchase, hold, sell and transfer shares of its own capital stock: Provided that no such corporation shall purchase its own shares of capital stock except from the surplus of its assets over its liabilities, including capital stock: Provided, further, that shares of capital stock shall be purchased only from earned surplus where there is outstanding another class of shares having a distribution preference over the shares purchased. Anything to the contrary notwithstanding, a corporation may in any event acquire its shares to collect or compromise in good faith a debt, claim or controversy against the corporation, or in settlement of a debt owing to the corporation where necessary to protect the corporation against loss, or to discharge an obligation of the corporation to a shareholder who has exercised the right of dissent from a proposed corporate merger or consolidation, as provided in this Chapter, or to discharge an obligation of

prevents redemption by an insolvent corporation of its own stock. Therefore, the trustee continues, another corporation (Dutch Oven) was formed to take over Baking Company's assets and to pay for Carroll's stock, because Carroll wished to do indirectly what he could not do directly. But Dutch Oven was rendered insolvent at its inception because it held only Baking Company's assets, falsely revalued, plus the new liability of the notes to Carroll, and therefore Dutch Oven's corporate existence should be disregarded as an attempt to avoid Ga. Code 22–1828(d). Dutch Oven and Baking Company should be alchemized and osmosed into the same company. A creditor of Baking Company existing at the time of this transaction [5] should be able to disregard it under Georgia law, to invalidate the purchase by Dutch Oven of Carroll's Baking Company stock, to ignore the lien which Dutch Oven gave Carroll on its assets, and to pursue the sums already paid Carroll under the Dutch Oven notes.

We first note that in each prong of the trustee's case (attacking the reclamation petition and seeking to gain the payments already made to Carroll) the trustee was saddled with the burden of proof. In a case under § 70e which is similar to the present case, Judge Tuttle stated:

"We are here dealing with a Mississippi statute which, by clearest implication, permits a corporation to retire its stock at will unless in the process it renders the corporation insolvent. It follows that where a particular transaction working a retirement of capital stock is attacked, the burden is on the moving party to show insolvency."

Alcott Company v. Raphael, 5 Cir. 1960, 275 F.2d 551, 557. It is the general rule that the burden of proving the elements necessary to sustain a recovery under § 70e rests upon the trustee. 4 Collier, Bankruptcy § 70.94[4] (14 ed. Moore 1964). This much covers the recovery sought by the trustee of the sums already paid Carroll under the notes.

As for the attempt by the trustee to defeat Carroll's reclamation petition by "avoiding" the sale as violative of state law, we hold that the same rule applies, and that such avoidance by use of § 70e is in the nature of an affirmative defense, placing the burden again upon the trustee. Trautwein v. Mandel, 8 Cir. 1942, 127 F.2d 567; see Lackawanna Pants Mfg. Co. v. Wiseman, 6 Cir. 1943, 133 F.2d 482; 4 Collier, Bankruptcy § 70.39 [3] (14 ed. Moore 1964).

The referee found as fact that Dutch Oven was insolvent at its inception. He based his finding solely on a comparison of the closing statement of Baking Company with the opening statement of Dutch Oven. The referee was particularly impressed by the writeup in value of the real assets and by the inclusion of the new "intangible asset"; he appears to have relied heavily on the fact that this increase in representation of asset value was just enough to counter the new liability of the Carroll notes and to give Dutch Oven a surplus of $990. He concluded that "the 'intangible asset' was created to make up the exact difference necessary to reflect a surplus."

We find this analysis unconvincing. These book entries are not in-

---

the corporation to a shareholder who has exercised his right of conversion of shares pursuant to the charter. No shares subject to redemption at the option of the corporation shall be purchased at a price exceeding the redemption price thereof. Shares of its own capital stock held by the corporation shall not be voted directly or indirectly nor counted as outstanding for the purpose of any stockholders' quorum or vote, or dividends or distributions of any kind whatsoever."

5. The trustee alternatively claims that even a creditor who became such only after the sale to Dutch Oven might attack the sale. This contention, in the absence of a claim that the sale was made "in contemplation of insolvency or for the purpose of defrauding * * * creditors" is without merit. Cohen v. George, 1920, 149 Ga. 701, 702, 101 S.E. 803. Such is the general rule. 15 A Fletcher, Corporations § 7416 (1947 Rev.).

fallible or irreversible apprisals which by hindsight imprison the transactions in question into an illegal pattern. There was undisputed evidence that the books and records of Baking Company did not show actual or true values of fixed assets (which accords with common practice) and included no sum for good will. Carroll testified that the business was worth more than $1,000,000. While of course Carroll was an interested party, still the record is barren of any contradictory or discounting testimony or any possible contrary inference.[6] On the other hand the testimony is that Baking Company earned $35,000 the month before the transaction was consummated. The Georgia statute prohibiting redemptions by an insolvent corporation was not conceived in terms of paper surplus or paper deficits. Neither does it invest a company statement with an aura of irrefutability, making it impenetrable by facts, but the trustee adduced no evidence tending to show what such facts may have been. It is common knowledge that only in most extraordinary circumstances are the book values of assets, especially intangible assets, equal to their true value. Compare the corporate franchise tax case of Oxford v. Macon Telegraph Publishing Co., 1961, 104 Ga.App. 788, 123 S.E.2d 277, which cites Edwards v. Douglas, 1925, 269 U.S. 204, 46 S.Ct. 85, 70 L.Ed. 235.

The trustee argues that Dutch Oven wrote up its book values in order to present a solvent balance sheet.[7] Even assuming arguendo that Dutch Oven did write up the values for that purpose, that fact has no significance for our purposes unless there was proof that the new values were unjustifiably high. Both the referee's opinion and the trustee's brief on appeal claim that there is something unsavory about the failure of Carroll to explain what they refer to as the discrepancies on the statements. The trustee had the burden of producing the explanation. As he came forward with nothing relevant, we hold that the finding of insolvency was clearly erroneous and that Ga.Code 22–1828(d) was not violated at the formation of Dutch Oven.

We hold that the trustee has presented no reason to pierce the corporate veil of Dutch Oven. Dutch Oven was a separate and viable corporation, it did not acquire its own shareholders' stock when it bought Carroll's Baking Company stock, and no payment of its obligation to Carroll violated Ga.Code 22–1828(d).

In Farmers Warehouse v. Collins, 1964, 220 Ga. 141, 137 S.E.2d 619, 625, the Georgia Supreme Court said:

"Where the courts have disregarded the corporate entity because the corporation is the mere alter ego or business conduit of a person, it has general-

6. Carroll testified that other parties were seeking to buy the business, and that he had offered the business for sale for a million dollars. He testified about negotiations to sell for that price to Howard Fisch, and to Highland Bakery. Outside of Carroll's testimony, the record has nothing to say about such negotiations, and all Carroll testified to was that these parties had been prospective buyers. From this minimal reference, the referee concluded: "A careful review of the testimony leads inescapably, [sic] to the conclusion that the best proposition that Carroll received was from the Calhouns and Jordan. Despite the intimate relationship between Carroll, the Calhouns, and Jordan, it is believed that Carroll would not have rejected the $1,000,000 cash offer of Highland Bakery, if it had been a bona fide offer. The Court notes that Highland

Bakery itself was in bankruptcy in this court shortly after September, 1961." Such a record does not support any inference that the business was not worth what Carroll said it was worth.

7. The opening statement of Dutch Oven was not prepared until several months after Dutch Oven was born; when it was prepared it was backdated to September 16, 1961. An interim unaudited statement dated November 29, 1961, contained the following entry:
"Unallocated Cost of Investment in Former Subsidiary in Excess of Net Assets Received as a Distribution in Liquidation: $420,955." The trustee's brief argues "This is an admission that it was necessary to 'write-up' the book values of the assets received in order to present a solvent balance sheet."

ly been on the idea that the corporate entity has been used as a subterfuge and to observe it would be to work an injustice. 'To establish the alter ego doctrine it must be shown that the stockholders' disregard of the corporate entity made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist; and to adhere to the doctrine of corporate entity would promote injustice or protect fraud.' Fletcher Cyclopedia Corporations, vol. 1, § 41.1, p. 169, and cases cited. See also Nadler, Georgia Corporation Law, 69, §§ 60–66; Condenser Service & Engineering Co., Inc. v. Brunswick Port Authority, 87 Ga.App. 469, 474(4), 74 S.E.2d 398; 18 C.J.S. Corporations § 7b, p. 380.

"Great caution should be exercised by the court in disregarding the corporate entity, for as pointed out in Exchange Bank of Macon v. Macon Construction Co., 97 Ga. 1, 5(1), 25 S.E. 326, 33 L.R.A. 800, 'Every corporation is a person,—artificial, it is true, but nevertheless a distinct legal entity. Neither a portion nor all of the natural persons who compose a corporation, or who own its stock and control its affairs, are the corporation itself * *.' We do not think that the allegations are sufficient to show that there was such unity of the individual defendants and the corporation as to make them one, or that the corporation was the mere conduit or alter ego of the defendants to the extent that the separate personalities of the corporation and the owners no longer exist."

Absent bad faith in its formation or its use as some nefarious instrumentality, Dutch Oven can stand independent and immune to the piercing operation which the trustee seeks to perform upon it here.[8] In Condenser Service & Engineering Co. v. Brunswick Port Authority, 1953, 87 Ga.App. 469, 474, 74 S.E.2d 398, 401–402, the opinion of the Georgia Court of Appeals demonstrates its hesitancy to disregard the corporate form:

"Volumes have been written on the subject of 'piercing the corporate veil,' etc. Many theories have been advanced as to the reasons why courts should

8. Cited by the Georgia court in *Farmers Warehouse* is our case of Page v. Haverty, 5 Cir. 1942, 129 F.2d 512. In that case, Judge Holmes wrote for the Court, at p. 514:

"It is true that taxation is a practical matter in which substance controls over form, but the existence of a corporate entity separate and distinct from the stockholders who own it is a fiction created and recognized by law as possessing *substance for tax purposes*. Ownership by a parent corporation of all the stock of its subsidiary does not warrant the disregard of their separate legal entities unless the subsidiary is so dominated and controlled that it is in fact a mere instrumentality of the parent, or unless the separate corporate structure is used to promote fraud or injustice. It is not claimed that separate corporate identity was maintained in furtherance of any unlawful purpose, and we think the record shows that the subsidiaries were not dominated by the parent to such an extent as would authorize the Commissioner to treat the subsidiaries and the parent as one entity for tax purposes. Haverty Furniture Companies, Inc., made no attempt to regulate any of its subsidiaries in the general conduct of affairs, and the business policies of each were fixed by its own board of directors. All purchasers, sales, personnel and managerial problems, and all financial negotiations of each subsidiary were conducted by its own officers and directors. Each maintained its own corporate and business records, set up its own reserves, paid its own debts, and declared its own dividends. As recited in the stipulation of facts, at all times after October 8, 1929, through 1934 the subsidiary companies continued to operate as *independent units* in the same manner as before 1929, and all of the services in connection with advertising or purchasing that the parent performed in behalf of the subsidiaries were compensated for by the subsidiaries. The exercise of such powers by the subsidiaries clearly demonstrates that they were far more then mere instrumentalities of the parent, and were *entitled to recognition as separate entities*."

disregard the separate corporate existence of a one-man corporation or a subsidiary corporation. By whatever means the conclusion to disregard corporate entity is arrived at, when it is reached it merely means that under the facts of the case the person or corporation in control of the subservient corporation is held liable for the acts or omissions of the subservient corporation. No hard and fast rule can be laid down, but it seems clear that so long as the law authorizes the formation of subservient corporations, the law would defeat its own purpose by disregarding its own creature merely because a parent corporation, or other sole owner, controls the subsidiary, or one-man corporation, and uses it and controls it to promote his or its ends. This principle has been stated many times. [citing cases] * * *

There is no allegation that the incorporation of Conseco was a sham or that it was used to defeat a public convenience, to justify wrong, protect fraud, defend crime, or any other reason which in equity and good conscience would justify the disregard of Conseco's separate entity."

■ We think that the following statement by the United States Supreme Court, though not in point, aptly expresses the proper standard:

"While corporate entities may be disregarded where they are made the implement for avoiding a clear legislative purpose, they will not be disregarded where those in control have deliberately adopted the corporate form in order to secure its advantages and where no violence to the legislative purpose is done by treating the corporate entity as a separate legal person."

Schenley Distillers Corp. v. United States, 1946, 326 U.S. 432, 437, 66 S.Ct. 247, 249, 90 L.Ed. 181, 184.

■ The referee declined to find that Carroll had acted in bad faith or with fraudulent intent. The record would not support such a finding. A hard bargain is not enough to energize the equitable power to disregard the corporate form. Carroll committed the business to others who risked $50,000, while Carroll deferred payment over twenty years. Carroll effectuated not only a separation but a divorce from his business. The before-and-after appearances of these corporations were dissimilar. Here the only nexus between Carroll and Dutch Oven was the sale itself. After the sale, there was not only a lack of domination and control by Carroll over Dutch Oven; there was not even any communication between them. We find that they were neither kith nor kin. Compare Fitzgerald v. Central Bank and Trust Co., 10 Cir. 1958, 257 F.2d 118; see Markow v. Alcock, 5 Cir. 1966, 356 F.2d 194.

■ Carroll's acts did not open the abyss of bankruptcy. That happened many transactions and four years later, all without his participation. The trustee would have it that Baking Company masqueraded as Dutch Oven, but it is difficult to imagine a four-year masquerade. The trustee repeatedly cites Pepper v. Litton, 1939, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281, and emphasizes this Court's power to disregard the form of a transaction where its underlying purpose achieves an unlawful end by indirection or violates fair play and equity. Of course the Bankruptcy Act commits the conscience of equity to its administration,[9] but before that conscience exacts

---

9. "§ 2. Creation of courts of bankruptcy and their jurisdiction. a. The courts of the United States hereinbefore defined as courts of bankruptcy are hereby created courts of bankruptcy and are hereby invested, within their respective territorial limits as now established or as they may be hereafter changed, with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in proceedings under this Act, in vacation, in chambers, and during their respective terms, as they are now or may be hereafter held, to—
    *     *     *     *     *
(2) Allow claims, disallow claims, reconsider allowed or disallowed claims, and allow or disallow them against bankrupt estates * * *." 11 U.S.C.A. § 11.

the toll of destroying rights, there must be evidence of clear fraud, use of a corporation as an alter ego, infidelity of a fiduciary, purposeful avoidance of a statutory duty, or a similar species of such genera.

"Courts are reluctant to pierce the corporate veil and destroy the important fiction under which so much of the business of the country is conducted, and will do so only under such compelling circumstances as require such action to avoid protecting fraud, or defeating public or private rights.

\* \* \*

"The burden in this case is upon [the creditor petitioning for a turnover order] \* \* \* to establish by pleadings and proof that Ludwig Bros., Inc. is 'an artifice and a sham designed to execute illegitimate purposes in abuse of the corporate fiction and the immunity that it carries.' Coryell v. Phipps, 5 Cir. 1942, 128 F.2d 702, 704."

Maule Industries v. Gerstel, 5 Cir. 1956, 232 F.2d 294, 297.

The Bankruptcy Act is specific as to preferences and frauds on creditors, and provides short periods of limitations therefor because it has an interest in fostering commercial stability and dependability. The trustee may range far more widely under the broad terms of § 70e, but we must be certain that his excursions are not fueled exclusively by presumptions, assumptions, and inferences.

The occurrences here do not add up to malevolent manipulations. We have been shown no reason why Carroll should be forced to help pay the debts of a bankrupt business whose only connection with him was that he had four years earlier sold it as a going concern to three men who then drove it to bankruptcy. That deep the fangs of the Georgia statute do not reach.

Affirmed.