**In the Matter of MULTIPONICS INCORPORATED, Debtor.**

**No. 71–218.**

United States District Court, E. D. Louisiana.

June 9, 1977.

George A. Kimball, Jr., George W. Pigman, Jr., Peter A. Feringa, Jr., New Orleans, La., Charles Seligson, for Carl Biehl and Machinery Rental, Inc.

Raymond Salassi, New Orleans, La., Sherwin Rodin, New York City, for Citibank.

Peter J. Butler, New Orleans, La., for trustee.

ʼN PROCEEDINGS FOR THE REORGANIZATION OF A CORPORATION

ALVIN B. RUBIN, District Judge:

This phase of a complicated corporate reorganization case involves the ranking of debts claimed to be due by the corporation to some of its former directors and corporations controlled by them. For reasons set forth below, the debts are subordinated to the claims of other creditors.

I.

Multiponics, Inc.[1] ("Multiponics") was organized and incorporated under the laws of Delaware on January 9, 1968, to engage in the business of large-scale farming. Carl Biehl and six other persons[2] became its first directors. These founder-directors initially capitalized the company by transferring to it their interests in certain farming properties and the outstanding stock of two companies.[3]

Approximately three years after the corporation was formed, on February 8, 1971, Multiponics filed a petition for a corporate reorganization pursuant to Chapter X of the Bankruptcy Act. 11 U.S.C. § 501 et seq. By the end of 1974, a trustee had been

1. It was at that time called Ivanhoe Associates, Inc.

2. The directors were Alfred J. Moran, Stanley Burkley, William J. Casey, N. Leslie Carpenter and James H. Swinny, and Lawrence F. Orbe. Subsequently, six other directors, whose names it is not necessary to mention, were elected.

3. See p. 9 of the Report of the Special Master. The companies were acquired in exchange for common stock of the debtor. Each director received a part of the debtor's stock in proportion to the value of their transferred asset. The companies acquired were the Lisbon Development Corporation and Blackhawk Clearing Company.

named,[4] all proofs of claim were filed, and Judge Herbert Christenberry (succeeded, after his death by Judge Jack M. Gordon, and later by this court)[5] referred all objections to the claims to Judge T. H. Kingsmill, Jr., one of the district's referees in bankruptcy, as Special Master to make findings.

He has made a full report, and objections have been taken to a number of his findings of fact and conclusions of law. These concern his recommendation that the debt due Carl Biehl be subordinated and that the debt due Machinery Rental, Inc., a Texas corporation wholly owned by claimant Biehl, not be subordinated. The objections to this report are the subject of this opinion. The unchallenged remainder of the Special Master's findings are adopted by the court, and judgment will be entered accordingly.[6]

## II. The Claim of Carl Biehl

Carl Biehl objects to the Special Master's subordination of his claim. That subordination is based on Biehl's conduct as a director of the debtor and is premised on the equitable principle that directors who mismanage corporate assets should not benefit when the corporation becomes bankrupt.

> The mere fact that an officer, director, or stockholder has a claim against his bankrupt corporation or that he has reduced that claim to judgment does not mean that the bankruptcy court must accord it pari passu treatment with the claims of other creditors. Its disallowance or subordination may be necessitated by certain

cardinal principles of equity jurisprudence. A director is a fiduciary. . . [citations omitted] Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein. . . . [citations omitted] While normally that fiduciary obligation is enforceable directly by the corporation, or through a stockholder's derivative action, it is, in the event of bankruptcy of the corporation, enforceable by the trustee.

*Pepper v. Litton,* 1939, 308 U.S. 295, at 306–307, 60 S.Ct. 238, at 245, 84 L.Ed. 281.

 Biehl is a sophisticated investor. He has a master's degree in business administration from the Harvard Business School and was an active businessman. Throughout the events in question, he was capable of understanding not only Multiponics' financial condition but the effect of each of Multiponics' intricate financial transactions. The Special Master's finding was not clearly erroneous and the court upholds it.[7]

The Special Master found that the debtor corporation was inadequately financed at its inception and improperly financed subsequently, and that these inadequacies were attributable to the conduct of the directors, including Biehl.[8] Specific examples,

4. On March 11, 1971, Judge Herbert Christenberry appointed William W. Herpel as trustee in reorganization.

5. The case was transferred to this section of the court on November 16, 1976.

6. One of the parties who objects to the failure to subordinate the Machinery Rental Claim is Citibank. Citibank became trustee for the debtor's debenture holders under a trust indenture dated October 15, 1968. The seven and one-half per cent debentures are due October 1, 1983.

7. The Special Master's findings will be upheld unless "clearly erroneous." Federal Rules of Civil Procedure 53(e)(2).

8. Counsel for Biehl contends that corporate mismanagement, illustrated in the following listed matters, should not be attributed to Biehl because Biehl was an "outside director," and cites a passage from a Second Circuit case, *Lanza v. Drexel & Co.,* 1973, 2 Cir., 479 F.2d 1277, as support for his contention. But that passage concerns the duty of directors not participating "directly in the implementation of corporate policies." *Id.* at 1306. Not only did Biehl vote on questions of corporate policy, he was a founder and major shareholder in the corporation. Needless to say, counsel's advertence on page 16 of Biehl's supplemental memorandum to the fact that Biehl was paid no fees as a director and received no officer's salary, is unavailing since fiduciary duty is not determined by fees or salary.

sketched in brief since the details may be found in the Special Master's Report, follow:

### A. The Acquisition of Stock in the Lisbon Development Corporation.

One of the original directors, Carpenter, owned all of the stock in the Lisbon Development Corporation ("Lisbon"), a farming enterprise. At the first meeting of the Board on January 10, 1968, the Board, including Biehl, voted to purchase Lisbon in exchange for 100,000 shares of the company's stock. The purpose of this purchase was ostensibly to acquire Lisbon's farms for the company's enterprise. However, the directors were "advised repeatedly before the closing of the Lisbon acquisition that Lisbon had incurred substantial liabilities . . . .." In spite of this knowledge, and the need of the embryonic company for equity capital, the directors determined to close the sale. After the sale was made, no adjustments were made in Carpenter's shares, issued to him in exchange for Lisbon, to reflect more recent appraisals of Lisbon's value.

In order for Lisbon to plant its crops in 1968, Carpenter had to make loans to it. These loans or advances were reimbursed by Multiponics, which borrowed $600,000 for that purpose. Soon after Multiponics acquired Lisbon, Carpenter sold 100,000 shares, received in exchange for Lisbon, to director Moran, at a profit of $1.00 per share. The Lisbon acquisition was imprudent, even if no self-dealing by Carpenter were shown, because Lisbon had substantial liabilities and could add nothing beneficial to the company's financial status. The purchase is an example of mismanagement by the directors because of their approval of a non-arm's length transaction with no financial benefits for the company.

### B. The Purchase of Shares by Director Orbe.

In February of 1969, Lawrence F. Orbe, another of the Multiponics directors, purchased 50,000 shares of its stock at $4.00 per share. The stock was issued and paid for with two 7% promissory notes payable on demand aggregating $200,000. Orbe borrowed $200,000 from Hibernia National Bank in order to pay the note, but the bank required the company to invest the $200,000 in a time certificate of deposit until Orbe paid his debt to the bank. By doing this, the company effectively pledged its assets as security for Orbe's personal loan. When it became evident this state of affairs imperiled the company's registration statement with the Securities and Exchange Commission and its chances for a public offering, the company liquidated its $200,000 certificate of deposit at Hibernia and thereby redeemed Orbe's shares. In effect, the company bailed him out.

While Orbe did not ultimately profit by this series of transactions, the purpose of the sale of shares to him was to compensate him for his services to the company by giving him an opportunity to gain an interest in the corporation. By redeeming his shares, the directors acted improperly in that they caused the corporation to discharge the obligation of one of their fellow directors. They deprived the company of the benefit of the $200,000 it had received from its initial sale. They also violated Section 7.07 of the debenture instrument which, for the protection of the debenture holders, forbade repurchase of its shares except under certain circumstances. The Special Master found that Biehl was aware of this situation or would have known of it because he received copies of minutes of Board meetings he did not attend. The Special Master concluded that Biehl voted for the repurchase out of neglect, and that conclusion is supported by the facts.

### C. CBK Industries Transactions.

The directors, including Biehl, resolved on May 10, 1968, to issue 200,000 of the company shares in exchange for 100,000 shares of the common stock of CBK Industries, Inc. ("CBK"). The purpose of this exchange was to bolster the value of the company's stock with what was believed to be the stock of a strong company. When it was discovered that CBK was not financially

sound, the directors voted to repurchase the stock.

During the initial negotiations concerning the stock, CBK had insisted upon a promise by the company to include in the company's public offering the 100,000 CBK shares or, if the public offering were delayed, a promise by director Orbe to place the shares privately. (This promise was a condition of CBK's agreement to eliminate from the stock purchase agreement the right to re-exchange the shares. The company did not want the right of re-exchange because, with that right, it could not carry the CBK stock as an asset on its balance sheet and could not use the stock as collateral.) By repurchasing the shares, the company relieved Orbe of his promise to place the shares. In order to repurchase the shares, because the re-exchange provision had been deleted from the original agreement, the company had to borrow $400,000 from ICB, a loan that was never paid.

Not only were the CBK transactions financially injurious to the company, they also violated the debenture indenture previously mentioned in this opinion. The Special Master found that the directors, including Biehl, knew or should have known that the debenture indenture was being violated, and his conclusion is not clearly erroneous. The court is satisfied that the Special Master's conclusion that Biehl was negligent in voting for the repurchase of the CBK stock is correct.[9]

#### D. Undercapitalization of the Company.

The company was formed by the transfer to it of the founders' encumbered farm properties in exchange for stock and cash. Each of these farms was either operating at a loss or not being operated at all. A value of $4.00 per share was set on the Multipon-

ics' stock for purposes of these transactions arbitrarily; this valuation did not reflect the true value of the company assets. Equity capital was sorely needed, but initial financing was gained by loans ostensibly made by third persons, and obtainable only because the directors personally guaranteed them. Debenture units were sold on October 25, 1968, but forty per cent of the proceeds was used to repay the directors for their initial loans to the company,[10] and to retire the company's liabilities. Counsel for Biehl points to the Haskin & Sells financial report for November of 1968 as evidence of healthy finances, but at the end of its first year of operation at December 31, 1968, the company's expenses exceeded its income by $1,000,000. This deficit increased to $2,500,000 in the next seven month period.

Even though the company's liabilities continued to exceed its income, operating funds were used to purchase new properties. The Special Master's report depicts in detail the initially poor and subsequently declining financial health of the company. Biehl does not contend that he was ignorant of this state of affairs. Nor are his inaction and negligence excusable in light of his expertise and experience in business matters.

#### III. The Claim of Machinery Rental, Inc.

#### A.

In April, 1970, Multiponics borrowed $1,500,000 from Chase Manhattan Bank and $1,500,000 from Deposit Guaranty Bank. These loans were each secured by chattel mortgages, deeds of trust and pledge agreements, and they were personally guaranteed by Biehl. The corporation could not have obtained either loan without the guarantee, and the ultimate real security for the loans was his endorsement. On April 5 and

---

9. The fourth and fifth "causes of action" considered the Special Master furnish no basis for subordination of Biehl's claim. With respect to the acquisition of stock of American Hydroponics Systems, Inc. ("AHS"), the facts found by the Special Master indicate no negligence or wrongdoing on the part of the directors, or particularly Biehl. With respect to the cash payments to Lawrence F. Orbe, no mismanage-

ment or impropriety by the directors was proven. The funds were paid to Orbe as compensation for his consultant services and were a reasonable expenditure.

10. The debenture holders were not advised that their investment would be partially used to pay off the directors.

15, 1970, after the filing of the reorganization petition, Machinery Rental, which, it must be remembered, was wholly owned by Biehl, a guarantor of the notes, purchased the notes. It now seeks to assert claims based on this acquisition.

The Special Master found that Machinery Rental's claim for the amount of the notes it purchased should not be subordinated, in spite of the relationship of Machinery Rental[11] to Carl Biehl, because no alter ego relationship existed and because a "legitimate business purpose" for the purchase existed.[12] The Special Master arrived at this conclusion even though he found: "The claim of Machinery Rental, Inc. consists principally of Biehl's personal obligations purchased by Machinery Rental, Inc. from Chase and the Deposit Guaranty National Bank." This finding was clearly erroneous and will not be upheld. F.R.C.P. 53(e)(2).

Machinery Rental was the instrumentality of Biehl when it purchased notes personally endorsed by Biehl; therefore, the claim of Machinery Rental should be subordinated if Biehl's claim is subordinated. The equitable principle that the court must look beyond appearances to the true status of things is applied to corporate reorganizations under Chapter X of the Bankruptcy Act. *Pepper v. Litton*, 1939, 308 U.S. 295, 60 S.Ct. 238.[13]

The mere fact that Biehl owned 100 per cent of the shares of Machinery Rental is not dispositive of the question. *Fawcett v. Mo. Pacific Ry. Co.*, W.D. La. 1965, 242 F.Supp. 675, aff'd per curiam, 5th Cir. 1965, 347 F.2d 233. But action by the corporation on behalf of an interested sole shareholder, such as payment of personal debts, when there is otherwise no business reason for the action, is strongly probative of manipulation by the sole shareholder.[14]

When Chase Manhattan and Deposit Guaranty pressed Biehl to pay Multiponics' note, Biehl had Machinery Rental discharge his personal indebtedness by acquiring the notes.[15] Machinery Rental contends that its business, apparent from its name, was furthered by this transaction because it would gain "certain tax advantages." The putative tax advantages would accrue *if* "the machinery could have been taken over from the trustee at its book value and there would have been a depreciation allowance on that which would have helped the total tax picture of Machinery Rental." Machinery Rental also contends that it would have sought to make a profit on the machinery by renting it to the trustee during the period of reorganization. Moreover, while negotiations were apparently carried on with regard to the proposed purchase,[16] and

---

11. Finding of Fact No. I-51.

12. The Special Master's Conclusion of Law No. 20 states:

> 20. Although Biehl owned 100% of the stock of Machinery Rental, no evidence has been presented which warrants ignoring its separate corporate entity and considering it as the alter ego of Biehl. Unlike the Moran Trust, it demonstrated a business reason for acquiring the obligations of the Chase Manhattan Bank and Deposit Guaranty National Bank which mortgage notes were valid and senior to the debenture obligations.

13. "In exercise of its equitable jurisdiction, the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in administration of the bankrupt estates." *Pepper v. Litton*, 1939, 308 U.S. 295, 60 S.Ct. 238. *In re Ahlswede*, 9 Cir. 1975, 516 F.2d 784, at 786. *Cf. Bangor Punta Operations, Inc. v. Bangor &*

*Aroostoock R. Co.*, 1974, 417 U.S. 703, at 713, 94 S.Ct. 2578, at 2584, 41 L.Ed.2d 418.

14. Machinery Rental cites *Maley v. Carroll*, 5th Cir. 1967, 381 F.2d 147, as supportive of its position, but that case is not apposite. The court merely held that the corporation had not, in fact, been used as an instrumentality of the owner.

15. On April 5, 1971, Machinery Rental purchased the secured claim of Chase Manhattan for $1,261,771.81. On April 15, 1971, Machinery Rental purchased the Deposit Guaranty claim for $450,000.00.

16. Machinery Rental's lawyer wrote the trustee's lawyer a letter containing a detailed proposal in which Machinery Rental would purchase Multiponics' equipment, introduced into evidence at trial as Exhibit D-616. The letter states in part:

Machinery Rental actually paid a non-refundable fee of $50,000 to the trustee as part of the transaction, the sale of the machinery was never consummated. By the time Machinery Rental purchased the notes, in April, the negotiations had floundered and the trustee had rejected Machinery Rental's offer.

While tax avoidance, combined with a non-tax related business reason, may constitute a valid business purpose, see *American Body and Equipment Co. v. United States*, N.D. Texas, 1974, 372 F.Supp. 525 at 527, aff'd 5 Cir., 511 F.2d 647, there is only a tenuous thread on which to hang the argument here. The proposition that a corporation for its own economic self-interest would purchase a note by an insolvent corporation in the process of reorganization at its full face value with the intention of making a profit on the rental of machinery which it might purchase at some future date and perhaps realize a tax advantage by means of the depreciation allowance deduction is implausible. Under the circumstances here, it appears to be nothing but a gauze to veil actions taken in Biehl's interest and for his purposes.

It is impossible to accept at face value the interpretation that Machinery Rental gives for its actions; the evidence suggests another interpretation. Biehl, seeking to rid himself of the onus of over a million dollars of indebtedness, determined to shift the load to a corporate entity under his sole control. Biehl himself testified that the notes were purchased "in order to satisfy the guarantees which had been made." Machinery Rental had no business reason to satisfy Biehl's personal guarantee. If Machinery Rental was motivated to purchase the notes by the hope that the sale of the machinery would eventually occur, it should have attempted, when the failure of the plan became apparent, to recover from the guarantor of the notes, Carl Biehl. That it did not do so is yet another sign of an alter ego relationship. This interpretation is consistent with the overall pattern of self-dealing by Carl Biehl found by the Special Master and affirmed by this court.

A letter sent to the trustee that contains the offer to purchase the machinery suggests that, even before the rejection of its proposal by the trustee, Machinery Rental planned the purchase as a means to benefit Multiponics. The letter states that the primary motive for the purchase would be to

> At such time as the Trustee for MULTIPONICS and the attorney for the Trustee approve, in principal, the suggestions set forth herein 1. PURCHASER will deliver to MULTIPONICS $50,000 which is the full purchase price but which will not be refundable in the event this transaction does not ultimately receive approval by the court after a public hearing, it being understood that the Trustee and his attorney will recommend this transaction to the court and use their respective best efforts to implement this agreement.
> \* \* \* \* \* \*
> 3. PURCHASER will make arrangements to acquire from the Chase Manhattan Bank (National Association) New York, New York, ("CHASE") and from Deposit Guaranty National Bank, Jackson, Mississippi ("DEPOSIT") all of the notes and other evidences of indebtedness and other claims against MULTIPONICS held by CHASE and DEPOSIT and will in effect, succeed to all of the rights and claims which said CHASE and DEPOSIT have against MULTIPONICS, including such pledges and security interests as the CHASE and DEPOSIT may have." (Emphasis supplied)

Biehl's misconception of the interchangeability of his own interests and those of Machinery Rental is evidenced by his manner of testifying at trial:

> Mr. Moran, if I remember rightly, took care of the ICB and Hibernia notes and . . . I took care of the Deposit Guaranty Bank and the Chase Manhattan Bank.
> Q. When you say you took care of, do you mean what you previously testified, Machinery Rental, Inc.—
> A. Machinery Rental, Inc. took care of it but Mr. Moran could not take care of those in any possible way so I had to do the job. Machinery Rental did take care of them though.

Tr. Vol. XV, p. 25, lines 24–25, p. 26, lines 1–24. With respect to Chapter X proceedings, Vol. 6A, Collier § 9.11 at page 224 states:

> The general rule is that for the purposes of classification the nature of a claim or share of stock must be determined as of the date when the reorganization petition was filed \* \* \*. (Footnotes omitted).

**1072**

facilitate the planting of a crop. While this goal was important to Multiponics and to the guarantors of its indebtedness, among them Carl Biehl, because it might fortify the failing corporation, it had no significance for Machinery Rental.

If a sole shareholder can manipulate his corporation for his own purposes and yet retain the advantage of separate status in a subordination proceeding, the equitable powers of a bankruptcy court can be thwarted. While the burden of proving an alter ego relationship is clearly upon the parties seeking disregard of the corporate entity, in this case, the indenture trustee and the reorganization trustee, *Maley v. Carroll*, 5 Cir. 1967, 381 F.2d 147; *Maule Industries v. Gerstel*, 5 Cir. 1956, 232 F.2d 294; *Coryell v. Phipps*, 5 Cir. 1942, 128 F.2d 702, that burden has been met. Machinery Rental, on the other hand, has failed to establish any but speculative and implausible explanations for its purchase of Biehl's debt. Therefore, the finding of the Special Master as to the purpose of the Machinery Rental purchase is clearly erroneous and will not be upheld.

### B.

Another issue remains to be resolved before Machinery Rental's claims may be subordinated. At the time of the filing of the reorganization petition, February 8, 1971, the notes were still owned by Chase Manhattan and Deposit Guaranty. It is a well-established principle of the law of equitable subordination that the status of claims is determined at the time of the filing of the bankruptcy petition.[17] Because the conduct of Chase Manhattan and Deposit Guaranty has been blameless, Machinery Rental contends that its own conduct and Biehl's are irrelevant: "The point is simple: Machinery Rental succeeded to the positions of Chase and Deposit Guaranty."

The principle that claims are characterized at the time the reorganization petition is filed is not immutable, nor does it dictate the result in this case. At the time the reorganization petition was filed Biehl was a guarantor of the notes, and the loans had been initially made only because of his guarantee. While Chase Manhattan and Deposit Guaranty were the named obligors, and Machinery Rental subsequently purchased the notes, Biehl was, in economic fact, the true creditor of Multiponics at the time the reorganization petition was filed. In effect, Biehl had advanced his credit to Multiponics. To characterize the claims as being in favor of the banks and against Multiponics would exalt form over substance.

Moreover, such a holding would invite manipulative behavior by potential bankruptcy claimants. Rather than lend funds directly to a corporation, a director might, as in this case, simply interpose a bank between himself and the borrowing corporation by guaranteeing the note and then purchasing it after the reorganization petition was filed. This result is incompatible with the equitable role of a court in bankruptcy. Accordingly, the Special Master's finding No. I–51 is reversed, and the claim of Machinery Rental is hereby subordinated to the debts due Multiponics' general creditors and debenture holders.

---

17. *United States v. Marxen*, 1939, 307 U.S. 200, 59 S.Ct. 811, 83 L.Ed. 1222.