JOHN R. BROWN, Circuit Judge:
 

 Today we conclude, or at least hope we do, a complex Chapter X reorganization involving Multiponics, Inc. The bankruptcy has engendered lengthy proceedings, sizea-ble records, and long hours by the parties, their counsel and the federal courts, culminating in three separate appeals. Here, in
 
 Multiponics I,
 
 we affirm the equitable sub
 
 *712
 
 ordination of a director’s claims but reverse the subordination of a corporation’s claim.
 
 Multiponics II,
 
 622 F.2d 725 at 727 (5th Cir. 1980)
 
 [1]
 
 involves the propriety of a bank to set off funds held in its accounts, while in
 
 Multiponics III,
 
 622 F.2d 731 at 733 (5th Cir. 1980), we review the validity of an award of attorneys’ fees. With these three opinions, we hope to close this case which has spanned nearly a decade, bringing a respite to debtor, creditors and courts alike.
 

 The Dawn And Dusk Of Multiponics
 

 Multiponics, Inc. (“Multiponics” or the “Company”),- the debtor corporation, was incorporated on January 9,1968. The Company was initially organized under the name of Ivanhoe Associates, Inc. to engage in the business of large-scale farming. Multiponics’ founders transferred their interests in certain farming properties and the outstanding stock of two businesses to capitalize the Company.
 
 [2]
 
 After only three short years, the Company commenced a Chapter X bankruptcy reorganization.
 

 There are two appellants and two appel-lees involved in this appeal. Appellants Carl Biehl and Machinery Rental, Inc. were claimants below. Biehl was a founding stockholder of the Company and served as a director from the Company’s first meeting throughout its existence. At the outset he owned 13.6% of the stock, although his percentage of ownership decreased to under 7% over the three years. His claims include his payment of $1,000,000 as personal guarantor of a loan to Multiponics and $212,500 paid by him on a note.
 
 [3]
 
 Machinery Rental is a Texas Corporation whose capital stock is wholly owned by Biehl. Its claim consists of notes guaranteed by Biehl which it purchased from certain banks.
 
 [4]
 
 The appellees are First National City Bank (“Citibank”), trustee under a $3,500,000 debenture issued by Multiponics in 1968, and William W. Herpel, bankruptcy trustee. They objected to the claims of Biehl, Machinery Rental and the other claimants below.
 

 The Days In Court And The Changing Of The Guard
 

 On February 8,1971, Multiponics filed its Chapter X petition. Numerous proofs of claim were filed before Judge Christenber-ry. A trustee was appointed who filed a plenary suit against all directors and officers of Multiponics, asserting six causes of action. The first five counts sought damages while the last — the subject of this appeal — asserted that proofs of claim, including those of Biehl and Machinery Rental, should be subordinated to claims of all other creditors. The plenary suit and objections were referred by Judge Gordon (who took the case following the death of Judge Chris-tenberry) to Bankruptcy Judge T. H. Kings-mill, Jr., as Special Master.
 

 Special Master Kingsmill heard evidence for approximately three weeks, reviewed numerous proposed findings of fact and conclusions of law, and ingested extensive briefs. On December 3, 1976, in a lengthy report, the Special Master denied the first five causes of action.
 
 In the Matter of Multiponics Inc.,
 
 No. 71-218 (E.D.La. Dec. 6, 1976). On the sixth count, however, the
 
 *713
 
 Master found that the officers and directors failed to capitalize adequately Multiponics and disregarded the debenture agreement. He ruled that the claims of Biehl and others be subordinated. As to Machinery Rental, however, the Master denied subordination.
 
 Id.
 

 Then District Judge, now Circuit Judge, Alvin B. Rubin, who succeeded to the case, upheld the Master as to Biehl but ruled the Master clearly erroneous as to Machinery Rental.
 
 Matter of Multiponics Inc.,
 
 436 F.Supp. 1065 (E.D.La.1977).
 
 [5]
 
 Thus, Judge Rubin subordinated the claims of Machinery Rental as well as those of Biehl. Not surprisingly, both Biehl and Machinery Rental appeal.
 

 I.
 

 Biehl’s Appeal
 

 A. The Claim
 

 Biehl’s claim against Multiponics consists of two elements totaling $1,212,500. First, in December of 1969, Multiponics obtained a $4,500,000 loan from Lehman Paper Company. Due to Multiponic’s poor financial health, Multiponics could draw only $3,500,-000 of the lines of credit, and was required to pay one year’s interest in advance at 9%
 
 %
 
 interest rate and to obtain the personal guarantees of Biehl and other shareholders as security for the loan. When the Company defaulted on the loan, Biehl paid $1,000,-000 to Lehman under his guarantee and received an assignment from Lehman in that amount. Second, also in December of 1969, Biehl personally guaranteed payment by Multiponics of a $400,000 note payable to Floyd L. McCalip. When the Company went into bankruptcy, Biehl paid McCalip $212,500 in satisfaction of his personal guaranty and obtained an assignment of McCalip’s claim.
 

 B. Our
 
 Standard—
 

 Equity, Fairness and Fiduciaries
 

 It is well established that a bankruptcy court has the authority to subordinate claims on equitable grounds. See
 
 Pepper v. Litton,
 
 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281, 289 (1939);
 
 Benjamin v. Diamond (In re Mobile Steel Co.),
 
 563 F.2d 692 (5th Cir. 1977). A Court’s conclusions of law are freely reviewable on appeal.
 
 United States v. Mississippi Valley Generating Co.,
 
 364 U.S. 520, 526, 81 S.Ct. 294, 297, 5 L.Ed.2d 268, 275 (1961);
 
 North Texas Production Credit v. Lee (In re Lee),
 
 570 F.2d 1301, 1302 (5th Cir. 1978). As to all findings of fact, however, a reviewing court of a bankruptcy decision must accept the findings as found, unless they are clearly erroneous. F.R.Civ.P. 52, 53(e);
 
 Costello v. Fazio,
 
 256 F.2d 903, 908 (9th Cir. 1958). Reversal may be particularly difficult where both a Special Master and a District Court concur in the findings.
 
 Comstock v. Group of Institutional Investors,
 
 335 U.S. 211, 214, 68 S.Ct. 1454, 1456, 92 L.Ed. 1911, 1915 (1948) (“A seasoned and wise rule of this Court makes concurrent findings of two courts below final here in the absence of very exceptional showing of error.” (Citations omitted)).
 

 Only recently we have rearticulated the proper test of error in subordination cases:
 

 (i) The claimant must have engaged in some type of inequitable conduct.
 

 (ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.
 

 (iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.
 

 In the Matter of Mobile Steel Co.,
 
 563 F.2d at 700 (citations omitted). In connection with (i), as in this case, the inequitable conduct which must be shown need not necessarily be related to the acquisition or assertion of the claim.
 
 Id.
 

 Our three part test may be a rewording of the proper legal standard, but is not a
 
 *714
 
 dramatic departure from our prior decisions. Thus, we reject Biehl’s argument that the District Court’s decision cannot stand as to him because it was rendered before
 
 Mobile Steel.
 
 Although neither the Special Master nor the District Court had the benefit of the precise holding and language of
 
 Mobile Steel,
 
 the rulings of both are wholly consistent with that case. Moreover, as we suggested in
 
 Mobile Steel
 
 regarding another case on which one party attempted to rely as precedent, bankruptcy cases are highly factual. Beyond their specific circumstances, their reach is limited. 563 F.2d at 703-04.
 

 As to the conduct of fiduciaries, special scrutiny must be given their dealings with the debtor. The bankruptcy court has the equitable power and the duty “to sift the circumstances surrounding any claim to see that injustice or infairness is not done in administration of the bankrupt estate.”
 
 Pepper v. Litton,
 
 308 U.S. at 308, 60 S.Ct. at 246, 84 L.Ed. at 290. This duty is “especially clear” when the claim would accrue to the benefit of an officer, director or stockholder.
 
 Id.; Spach v. Bryant,
 
 309 F.2d 886, 888 (5th Cir. 1962). See also Herzog & Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L. Rev. 83, 101 (1961) (“the bankruptcy court will regard such a transaction [between a fiduciary and the corporation], if not with distrust, then certainly with a large measure of watchful care in order to be satisfied that the transaction was entered into in good faith and not solely with a view to his own benefit.” (Footnote omitted)). While the mere “opportunity to do wrong” is not proscribed, the “unconscionable use” of such an insider opportunity may suffice to deprive the wrongdoer of the fruits of his wrong.
 
 Comstock v. Group of Institutional Investors,
 
 335 U.S. at 229, 68 S.Ct. at 1463, 92 L.Ed. at 1923. The presence or absence of the “earmarks of an arm’s length bargain” may be significant,
 
 Pepper v. Litton,
 
 308 U.S. at 306-07, 60 S.Ct. at 245, 84 L.Ed. at 289, and the conduct of a small rather than large number of directors may be subject to even greater scrutiny for indicia of fair dealing and candor.
 
 Twin-Lick Oil Co.
 
 v.
 
 Marbury,
 
 91 U.S. 587, 590, 23 L.Ed. 328, 330 (1875), quoted with approval in
 
 Pepper v. Litton,
 
 308 U.S. at 307 n. 14, 60 S.Ct. at 245 n. 14, 84 L.Ed. at 289 n. 14.
 

 In examining fiduciary claims in bankruptcy, the question of the burden of proof, albeit a slippery concept, may be critical.
 
 Pepper v. Litton
 
 provides that the dealings between fiduciaries and their corporations
 

 are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged
 
 the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.
 

 308 U.S. at 306, 60 S.Ct. at 245, 84 L.Ed. at 289 (citation omitted) (emphasis added). This Court in
 
 In re Mobile Steel Co., supra,
 
 elaborated on the nature of the burden of proof requirement. There we held that the burden of proof never shifted from the trustee to the fiduciary because the trustee never came forward with enough proof of unfairness to warrant subordination. We explained that, once a fiduciary-claimant files a verified proof of claim, the objecting trustee has the burden of coming forward with enough substantiation to overcome the fiduciary’s prima facie case. Only after the objecting trustee meets his burden of coming forward, will the burden of proving fairness shift to the fiduciary. This proof allocation provides a proper balance of burdens, assuring that the trustee does not underprove his objections while, at the same time, assuring that the fiduciary need not overprove his good faith and fairness at' the mere cry of inequity by the trustee. Accord
 
 Sinclair v. Barr (In re Mid-Town Produce Terminal,
 
 Inc.), 599 F.2d 389, 394 (10th Cir. 1979) (similarly allocating the burden of proof).
 

 C. Conducting The
 
 Inquiry—
 

 A Fiduciary Taken To Task
 

 (i) The Inequitable Conduct
 

 In our cáse, as we demonstrate below, the objections by Citibank and the
 
 *715
 
 bankruptcy trustee were substantial. At all relevant times Biehl was a director of the Company, a substantial shareholder as well as one of its founders. While the facts are complicated, in at least three transactions and regarding the overall capitalization of Multiponics, appellees brought forth material facts showing that Biehl’s conduct was inequitable. The burden of proving fairness, then, shifted to Biehl. We hold that the Master’s findings and conclusions, affirmed by the District Court, properly established that, under all the facts and circumstances, burden in hand, Biehl failed to establish that his fiduciary conduct regarding the Company was in good faith and fair in the bankruptcy sense.
 
 [6]
 

 (a) Lisbon Corporation Stock Acquisition
 

 At the first meeting of its Board of Directors, the Board voted to purchase all of the stock of Lisbon Development Corp., wholly owned by N. L. Carpenter. Even though the Master found no proof of specific damage regarding the Lisbon acquisition, the Master did find, and the record supports his findings, that the founding officers, and directors engaged in an “overall pattern of self-interest” and that the Lisbon capitalization device operated to the “detriment of the company’s financial structure.” Carpenter was compelled to make short-term loans to Lisbon, which the Master found to be necessary to develop and maintain the property. This increased Lisbon’s debt to Carpenter by over $300,000. As a result of learning of these advances, one director concluded the advances should be discharged or the amount of shares issued adjusted. Neither was done. Instead, not only was the deal closed without any accommodation, but also, Multiponics had to borrow the entire purchase price to pay Carpenter, in the amount of $600,000. The loan could only be obtained with the personal guarantees of the Company’s principal shareholders. Multiponics sank further into debt.
 

 Moreover, the Lisbon acquisition was not an arms-length transaction. Carpenter, sole shareholder of Lisbon, was also a member of the Multiponics Board of Directors. Indeed, there was credible evidence that if Multiponics had not been formed and Lisbon not acquired, Biehl and four other Company officials would each have been obligated to Carpenter to purchase a 15% interest in Lisbon. As it was, less than one year after closing, Carpenter sold all of his shares to director Moran at a profit of $1 per share.
 

 In addition, there is also some discrepancy concerning the appraisals of the Lisbon properties. An initial appraisal exceeded Lisbon’s balance sheet fixed asset value by over $200,000. However, only four months later, another appraisal valued the properties at $200,000 less than the first one. Two years later, supposedly after considerable improvements were made on the properties, the same first appraiser valued the properties at even $100,000 less than its own original estimate.
 

 All of the directors, including Biehl, knew all of these facts regarding the Lisbon acquisition and all acquiesced. As the Master observed, before the deal was closed they were “advised repeatedly that Lisbon had incurred substantial liabilities, not reflected on the balance sheet upon which they voted to purchase Lisbon.” Regardless, Biehl and the rest continued with the transaction, failing to heed the danger signals before them, managing the Company deep' and deeper into debt. None of these findings are clearly erroneous.
 

 (b) Sale And Repurchase Of Shares By Director Orbe
 

 The Master’s findings as to the Orbe transaction are fully supported in the
 
 *716
 
 record. As compensation for services to the Company, Multiponics granted Lawrence F. Orbe, another director of Multiponics, an option to purchase 50,000 shares of its stock at $4 per share. Orbe purchased the shares by effectively borrowing from the Company itself. Orbe gave two 7% demand notes totaling $200,000. Another director, Alfred J. Moran, then arranged a $200,000 bank loan to Orbe to pay the note. Multiponics pledged its own assets as security for the bank loan to Orbe by investing the $200,000 from Orbe in a certificate of deposit which had to be left with the bank as collateral. Meanwhile the Company prepared to make its first registered public offering. When the Company was advised that the offering’s success was endangered by the debts owed to the Company by directors, Multi-ponics liquidated the $200,000 certificate of deposit, redeeming Orbe’s shares.
 

 This arrangement, requiring Multiponics to pledge its own assets to sell its own stock was, as the Master suggested, suspect. While Orbe did not benefit from the repurchase and the Company’s intent presumably was to enhance the possibility for the success of a public offering, the directors, by redeeming Orbe’s shares, deprived the Company of the $200,000 it would otherwise have received from the initial sale. Moreover, the Company violated the debenture agreement which, except for certain circumstances not applicable here, forbade the Company’s repurchase of its own shares. The very purpose of the indenture repurchase restrictions was to protect the debenture holders from unwarranted reduction of the Company’s equity base upon which they must rely in lending money. As the Master found, Biehl was on notice of the provisions of the indenture. And since he received copies of the minutes of all the Board meetings, Biehl knew or should have known of the stock repurchase and debenture violation.
 

 (c) Exchange And Re-Exchange Of Stock With CBK Industries
 

 The Master’s findings and conclusions regarding the CBK transaction were also proper. On May 10, 1968 Biehl along with Multiponic’s other directors voted to exchange 200,000 shares of Multiponics stock for 100,000 shares of the stock of CBK Industries. One of the primary purposes of the exchange was to support the Multiponics $4 stock price (which the Master found to be arbitrary) by acquisition of the stock of a healthy company. Although initially a right of exchange of stock was provided, the Company eliminated this right when it was determined that the provision undermined, rather than bolstered, the $4 share price. As consideration for the elimination of this provision the Company promised to offer the 100,000 CBK shares in its public offering or, if delayed, Orbe agreed to place the shares privately.
 

 The Company then discovered that CBK was in poor financial health. Orbe, neatly avoiding his commitment to place privately CBK’s shares, offered to repurchase from CBK the shares in the name of Multiponics. At the time when he made the offer, however, he lacked the authority to do so. And, it was only later that the offer was ratified by the Company.
 

 This repurchase, like the Orbe repurchase, was in direct violation of the debenture. Moreover, to finance the repurchase, the Company once again had to borrow additional funds, this time $400,000 and again only with the personal guarantees of Biehl among others. Although Biehl did not attend all of the relevant Board meetings, he received their detailed minutes. As the Special Master found, Biehl knew or should have known about all of these transactions.
 
 [7]
 

 (d) Undercapitalization And Other Inequitable Conduct
 

 The Master’s findings on Multiponics’ undercapitalization and related im
 
 *717
 
 proprieties were also valid. Undercapitali-zation, often a “bed fellow of other insider misconduct,” Herzog & Zweibel, 15 Vand.L. Rev. at 94, also tips the equities toward subordination. Under the “Deep Rock” doctrine, a stockholder’s loans to his company will be treated as capital contributions when under the equities a company is deemed undercapitalized.
 
 Pepper v. Litton, supra; Taylor v. Standard Gas Co.,
 
 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939). While the mere fact of an insider loan may be insufficient to warrant subordination,
 
 In re Mid-Town Product Terminal, Inc., supra,
 
 we agree with the Master and District Court that under all the facts and circumstances of this case, Multiponics’ capital base was inadequate.
 

 As we observed in
 
 In re Mobile Steel Co., supra,
 
 the concept of undercapitalization has never been precisely defined. 563 F.2d at 702. The Supreme Court has explained, “where the paid-in capital is purely nominal, the capital necessary for the scope and magnitude of the operations of the company being furnished by the stockholder [will be treated] as a loan.”
 
 Pepper v. Litton,
 
 308 U.S. at 310, 60 S.Ct. at 246-47, 84 L.Ed. at 291 (footnote omitted). Necessarily, this inquiry is highly factual and may vary substantially with the industry, company, size of the debt, account methods employed, and like factors. The primary inquiry of this Court is to ask whether, under the eircum-stances, reasonably prudent men with general business background would deem the company undercapitalized.
 
 In re Mobile Steel Co.,
 
 563 F.2d at 703. To particularize that standard we have explained:
 

 (1) Capitalization is inadequate if, in the opinion of a skilled financial analyst, it would definitely be insufficient to support a business of the size and nature of the bankrupt in light of the circumstances existing at the time the bankrupt was capitalized;
 

 (2) Capitalization is inadequate if, at the time when the advances were made, the bankrupt could not have borrowed a similar amount of money from an informed outside source.
 

 563 F.2d at 703.
 
 [8]
 

 The time frame for an analysis of the extent of capitalization may vary. Generally we look to initial capitalization, asking whether a company was adequately capitalized at the time of its organization. This was the approach employed in our decision of
 
 In re Mobile Steel, supra.
 
 Subsequent capitalization may also be relevant to our inquiry, however, in at least two respects. First, evidence of inadequate subsequent capitalization may be indicative of initial undercapitalization. While we do not condone an approach of hindsight in capitalization cases, a view of the later time frames may shed light on earlier ones. Second,
 
 *718
 
 proof of subsequent undercapitalization may be further proof of inequitable conduct, such as actions of gross mismanagement, self interest, and the like, and, if the information is analyzed with care, may shed light upon the economic reality of financial commitments to a company.
 

 In
 
 Mobile Steel,
 
 the bankruptcy judge subordinated some of the claims of organizers, directors, and officers of the bankrupt company partly on the basis of initial un-dercapitalization. The District Court affirmed. We presented our two prong capitalization analysis, however, and reversed. As to the first test, we explained that there was no evidence one way or the other. Under the second test, we recognized that the bankrupt was able to borrow $800,000 at the outset from an independent source, suggesting that a substantial creditor did not perceive the debtor as undercapitalized. Moreover, the company was organized with a quarter million dollars which we could not say was merely nominal. And, the shortage of capital never contributed to the financial demise of the company.
 

 In our case, however, there is substantial evidence in the record regarding both tests of capitalization. Under either approach, Multiponics was undercapitalized.
 

 Under the first test, unlike
 
 Mobile Steel,
 
 there was testimony that Multiponics was seriously underfinanced from its inception and grew financially weaker throughout its brief existence. Lawrence F. Orbe, an ad-visor in the corporate finance department for the firm of Glore Forgan, William R. Staats, Inc. and a director of Multiponics, testified that Multiponics was terribly un-derfinanced from its very inception.
 
 [9]
 
 Alfred Moran, a graduate of the Harvard Business School, an experienced businessman, a director of the Company, and the source of the idea for Multiponics, also testified that the Company was in difficult condition at the outset, remained in difficult condition and was never properly financed.
 
 [10]
 

 
 *719
 
 The record supports this testimony. In January 1968, at the time of organization, Multiponics consisted of various farming properties appraised at values the Master found inflated. All of this property was encumbered, operating at a loss, or not in operation. In October 1968, at a time when the Master found that the Company required equity capital, not debt, the Company sold debenture units. Multiponics used 40% of the sales to pay debts owing itself from the Company. By December 31, 1968 the Company’s current liabilities exceeded its current assets by $1 million. In addition, both Multiponics and Lisbon, then its subsidiary, had a deficit in retained earnings exceeding $500,000. During the next several months, the Company’s deficit reached $2,500,000.
 

 Meanwhile, Multiponics used its funds not for operations, but to acquire additional farm property and to repurchase its own shares from one of its directors (in violation of the debenture) and to repurchase an entity in which directors had financial interest. By July 31, 1969, as the Master found, the Company’s deficit in working capital exceeded $3,300,000 and the net proceeds of the first projected public offering, if successful, would not have been sufficient to supply its capital requirements for the rest of the year.
 

 Even if Multiponics passes the first test of capitalization, Multiponics fails the second test. When the advances were made to Multiponics, the Company could not have borrowed a similar amount of money from an informed outside source on the strength of its assets alone. See
 
 Sinclair v, Barr (In
 
 re
 
 Mid-Town Produce Terminal, Inc.),
 
 599 F.2d 389, 392 (10th Cir. 1979). It is true that not all of Multiponic’s lenders required substantial outside security at the outset. Debenture holders provided $3,500,000, Northwest Mutual Life Insurance Company loaned $3,650,000 in March of 1969 and, at that same time, the Chase Manhattan Bank loaned Multiponics $2,900,000. However, at least one of these three financings did require additional security soon after the loan was made. Within several months, Chase visited the Company’s properties only to find extensive crop failures. Chase wrote a critical letter to Multiponics, commenting that the Company’s prior reports had been “very misleading”. In 1970 Multiponics defaulted on the loan. Chase agreed to renegotiate the loan but only after several directors, including Biehl, gave their personal guarantees and security was taken in the Company’s assets. And, at the very time of the roll-over of the loan, Multiponics expended funds to repurchase 250,000 shares of its own stock from directors or entities in which directors had financial interests.
 

 Moreover, from early in Multiponics’ history, other financing was obtained only with the personal guarantees of directors. To acquire Lisbon Corporation, Multiponics obtained a loan from First National Bank of Memphis only on the condition that Mul-tiponics’ principal stockholders guarantee the loan. Indeed, one of the stockholders, William J. Casey, concerned about the Company’s finances, wrote in a memo to the Board, “The hard truth is that this operation already has all the working capital credit which it can justify. Anybody put
 
 *720
 
 ting up another dime is putting up high risk money.” Rather than following Casey’s suggestion of stock registration, the Board decided to place debenture units, adding to the Company’s burden of debt and avoiding the dilution of the equity of Multiponic’s principals. Similarly, the CBK loan was obtained only with the personal guarantees of the Company’s principals.
 

 Additional monies were available to Mul-tiponics but only through the vehicle of personal guarantees. In December of 1969, Biehl and other directors guaranteed a $400,000 mortgage note to Floyd L. McCal-ip. In February 1970 Multiponics obtained $4,500,000 line of credit from Lehman Commercial Paper Company, but had to pay a full year’s interest in advance, reducing the monies actually available to Multiponics to $3,500,000. Even that sum was made available only when Biehl and several other directors provided unconditional letters of credit. This still proved insufficient to cure the defaults of the Chase loans. In August through December of 1969 Multiponics borrowed $450,000 from Deposit Guaranty National Bank, all of which had to be personally guaranteed by several directors, including Biehl.
 

 In addition, unlike in
 
 Mobile Steel,
 
 the insufficient capital base was a primary cause of the Company’s failure. See Herzog & Zweibel, 15 Vand.L.Rev. at 96 (discussing this factor). The Special Master held, and the District Court agreed, that the disastrous conduct by the directors “led inevitably to the Company’s demise.” Master’s Conclusion of Law 17; 436 F.Supp. at 1067-69.
 

 Moreover, the brief three-year life of the Company draws further into question the bona fides of the “loan” arrangements. See
 
 Arnold v. Phillips,
 
 117 F.2d 497 (5th Cir.),
 
 cert. denied,
 
 313 U.S. 583, 61 S.Ct. 1102, 85 L.Ed. 1539 (1941) (suggesting the converse principle that the longer a corporation functions financially on its initial capital prior to advances, the greater the probability the advances will be held to be valid loans); Herzog & Zweibel, 15 Vand.L.Rev. at 96.
 

 Biehl knew or should have known of the serious financial straits of the Company. Biehl held a Master’s Degree in Business Administration from Harvard University and was, along with other directors, an experienced businessman. He was always provided with current internal financial information and outside auditor’s financial statements. At all relevant times, Biehl was a director of the Company, a substantial shareholder, as well as one of the founders. Biehl voted for, approved of, or failed to object to all of the above transactions. Indeed, there is some evidence in the record, which the Master noted, that Biehl did not attend many Board of Directors meetings and that Biehl was not aware of some of the essential facts surrounding critical transactions involving Multiponics. For example, regarding the CBK transaction, Biehl testified that he did not know about the re-exchange provisions. Moreover, he admitted that, had he known, he would have voted
 
 against
 
 the transaction. Biehl’s input — or repeated lack of input— regarding the financial foundation of the Company did not constitute merely errors of judgment, but, rather, improvident and unacceptable conduct of a fiduciary.
 

 (ii) Injury Or Advantage
 

 Apart from inequitable conduct,, injury to Multiponic’s creditors or advantage to Biehl must be shown. Biehl argues that he may have been foolish but he perpetuated no fraud on the Company. It is well established that actual fraud need not be shown for equitable subordination. See
 
 Heiser v. Woodruff,
 
 327 U.S. 726, 732-33, 66 S.Ct. 853, 855-56, 90 L.Ed. 970, 976 (1946). Neither will mere good faith negate the harm sustained by Multiponic’s creditors nor will it mask the advantage gained by Biehl and his compatriots. See
 
 Gannett Co. v. Larry,
 
 221 F.2d 269, 275 (2d Cir. 1955).
 

 Biehl also contends that there was no showing of any actual injury to the Company so subordination cannot be allowed. He reminds us that the Special Master dismissed the first five causes of action against the directors, specifically finding
 
 *721
 
 that the Company was not damaged by their acts. Biehl’s reading of what the Master found may be inaccurate. The Master found no damage to the Company regarding the personal liability of the directors under the first five causes of action. The Master did not find that the Company was not damaged at all. Rather, it is at least arguable that the Master, by finding the Company undercapitalized, found it damaged as well.
 

 Moreover, Biehl misconstrues the test of injury. What must be shown is that the misconduct resulted in injury
 
 “to the creditors
 
 of the bankrupt,” not necessarily directly to the bankrupt itself. Thus, even though Multiponics may have experienced no direct harm, the lenders may have nonetheless been injured. In this case, such injury was shown. Most obviously, the Orbe stock transaction and the CBK exchange violated the indenture agreement. That violation substantially impaired the position of the debenture holders which they had carefully sought to protect by a detailed, written, prior agreement.
 

 Moreover, the various lenders to the Company relied upon Multiponics’ characterization of its capitalization in making their loans. The inaccurate financial picture of Multiponics created by Biehl and the other directors substantially increased the risk at which the monies were lent, causing the lenders to wind up jockeying for position in the reorganization proceedings. As the Fourth Circuit has explained in supporting subordination, “Rather than invest more capital the officers and stockholders, by the use of borrowed funds, substantially shifted and evaded the ordinary financial risks connected with this type of business enterprise and, at the same time, permitted the corporation to remain in a constant state of or in imminent danger of insolvency.”
 
 Braddy v. Randolph,
 
 352 F.2d 80, 82 (4th Cir. 1965).
 
 [11]
 
 Accord
 
 Wood v. Richmond (In re Branding Iron Steak House),
 
 536 F.2d 299, 302 (9th Cir. 1976).
 

 (iii) Harmony With The Bankruptcy Act
 

 As we discussed above, bankruptcy courts are courts of equity,
 
 In re Mobile Steel Co.,
 
 563 F.2d at. 699;
 
 Local Loan Co. v. Hunt,
 
 292 U.S. 234, 240, 54 S.Ct. 695, 697, 78 L.Ed. 1230, 1232 (1934), guided by the principle of equality of distribution,
 
 Sampsell v. Imperial Paper Corp.,
 
 313 U.S. 215, 61 S.Ct. 904, 85 L.Ed. 1293 (1941), but, at the same time, authorized to prevent courses of conduct otherwise fraudulent, abusive or unfair, 563 F.2d at 699;
 
 Pepper v. Litton,
 
 308 U.S. at 304-05, 60 S.Ct. at 244, 84 L.Ed. at 287-88 (the equitable powers of the bankruptcy court “have been invoked to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done”); Herzog & Zweibel, 15 Vand.L.Rev. at 85 (“the Courts will be guided by cardinal principles of equity jurisprudence to the end that injustice or unfairness is not done in the administration of the bankrupt estate.”) As one commentator has suggested, particularly where a holistic picture of inequitable dealing is present, equitable subordination serves a useful function in bankruptcy administration. See Clark, The Duties of the Corporate Debtor to its Creditors, 90 Harv.L.Rev. 505, 537-38 (1977). This may be especially true where the debt- or sells a substantial amount of debenture units to the investing public.
 

 
 *722
 
 While the facts are complicated, viewing all the surrounding circumstances, we cannot say that the Master was clearly erroneous in his findings or erroneous in his conclusions from those findings. Biehl authorized and participated in repeated violations of the debenture, non-arms-length transactions, mortgages upon personal guarantees upon increasing business expansion, and a capitalization only “two jumps ahead of the wolf.”
 
 [12]
 
 Biehl’s conduct as a fiduciary caused injury to Multiponics’ other creditors in dark discord with the purposes of the Bankruptcy Act. Where ingenuity spawns unprecedented vagaries of unfairness, we should not decline to recognize their marks, nor hesitate to turn the twilight for Biehl into a new dawn for other creditors.
 

 II.
 

 Machinery Rental's Review
 

 A.The Claim
 

 The Machinery Rental story is somewhat simpler. As we sketched above,
 
 supra
 
 p. 719, in May of 1969 Multiponics borrowed $2,900,000 from the Chase Manhattan Bank. In June of 1970 Multiponics was in default on the loan. To renegotiate the loan, Chase required and received a pledge of Multipon-ics’ crops, real property and equipment, the personal guarantees of several directors and, most importantly for us, the personal guarantee of Biehl.
 

 Thereafter, from August through December of 1969, Multiponics borrowed $450,000 from the Deposit Guaranty National Bank. Once again, Biehl and other directors extended their personal guarantees, this time from the very outset of the loans.
 

 In February and March 1971, when the Company again defaulted, Chase and Deposit Guaranty demanded that Biehl pay the balance of the loans then due, which amounted to $1,711,771.81. In April 1971, however, Machinery Rental purchased these promissory notes and filed a proof of claim in that amount.
 

 B.Ruling And Alteration Of The Ruling
 

 The Trustee sought to subordinate this claim along with Biehl’s personal claims on the theory that Machinery Rental was merely the alter ego of Biehl since Biehl at all times owned all of the outstanding stock of Machinery Rental. However, the Master found as a fact:
 

 I 51. Although Biehl owned 100% of the capital stock of Machinery Rental, there is no other evidence in the record to warrant or justify its not being considered a legal entity separate and apart from Biehl.
 

 The Master, in his findings of law repeated his finding of fact and concluded that Machinery Rental, “demonstrated a business reason for acquiring the obligations of the Chase Manhattan Bank and Deposit Guaranty National Bank which mortgage notes were valid and senior to the debenture obligations.” Accordingly, the Master denied subordination.
 

 On the very same record, however, the District Court reversed. Although the District Court cited no evidence in the record, Judge Rubin characterized Machinery Rental’s purported business purpose as “implausible” and the Master’s finding of fact I 51 as clearly erroneous. After our own review of the record, examining the Master’s findings under the clearly erroneous standard, we cannot agree with the District Court and reinstate the Master’s finding of fact and conclusion of law.
 

 C.Clearing The Clearly Erroneous Hurdle?
 

 A District Court may only reverse the findings of a Special Master if they are clearly erroneous. F.R.Civ.P. 52(a), 53(e)(2). By the same token, we must review the findings of the Special Master and may affirm the District Court’s reversal only if we also deem the Master’s findings clearly erroneous.
 
 Bazemore v. Stehling,
 
 396 F.2d 701 (5th Cir. 1968).
 

 
 *723
 
 What this means is that such findings “come here well armed with the buckler and shield” of F.R.Civ.P. 52(a);
 
 Horton v. U. S. Steel Corp.,
 
 286 F.2d 710, 718 (5th Cir. 1961); quoted with approval in 9 Wright & Miller, Federal Practice and Procedure § 2585, p. 729. See also Note, Federal Rule of Civil Procedure 52(a) and the Scope of Appellate Fact Review: Has Application of the Clearly Erroneous Rules Been Clearly Erroneous? 52 St.John’s L.Rev. 68 (1977). The burden is squarely on the appellant to show an appellate court that a finding is clearly erroneous,
 
 Griffin v. Missouri Pac. Ry. Co.,
 
 413 F.2d 9 (5th Cir. 1969), and reversal of a finding is proper only when “although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.”
 
 United States v. United State Gypsum Co.,
 
 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746, 766 (1948);
 
 Inter-Cities Navigation Corp. v. United States,
 
 608 F.2d 1079, 1082 (5th Cir. 1979). An appellate court may not consider the evidence de novo,
 
 Zenith Radio Corp. v. Hazeltime Research, Inc.,
 
 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129, 148 (1969), and must be particularly reluctant to disregard a finding based on evaluation of testimony drawing credibility into question,
 
 Graver Tank and Mfg. Co. v. Linde Air Products Co.,
 
 336 U.S. 271, 275, 69 S.Ct. 535, 537-38, 93 L.Ed. 672, 676 (1949). Merely because a reviewing Court on the same evidence may have reached a different result will not justify setting a finding aside.
 
 United States v. National Association of Real Estate Bids,
 
 339 U.S. 485, 495-96, 70 S.Ct. 711, 717, 94 L.Ed. 1007, 1016-17 (1950).
 

 In our case, therefore, the burden of proving an alter ego relationship rests squarely on the shoulders of the party seeking to disregard the corporate entity, here the indenture and reorganization trustees.
 
 Maley v. Carroll,
 
 381 F.2d 147 (5th Cir. 1967);
 
 Maule Industries v. Gerstel,
 
 232 F.2d 294 (5th Cir. 1959);
 
 Coryell v. Phipps,
 
 128 F.2d 702 (5th Cir. 1942). After a careful review of the record, we must agree with the Master that the trustees have failed to carry their burden.
 

 The record reveals that Machinery Rental presented evidence that its purchase of the claims of Biehl was for a valid business purpose. Machinery Rental sought to purchase the machinery of Multiponics primarily in order to obtain a depreciation allowance to reduce Machinery Rental’s tax liability and secondarily to rent out the machinery at a profit. It is unquestioned that tax avoidance, particularly when coupled with another non-tax advantage, may constitute a valid business purpose.
 
 American Body and Equipment Co. v. United States,
 
 511 F.2d 647 (5th Cir. 1975);
 
 Woolley Equipment Co. v. United States,
 
 268 F.Supp. 358, 364 (E.D.Tex.1966) (“In fact, tax considerations have become so important today that tax avoidance
 
 alone
 
 may well constitute a legitimate business purpose for transacting business in a particular manner.” (emphasis theirs)). The mere fact that tax benefits are sought is not a proper ground for invalidating the business purpose nor for attributing any evil motive to the participants.
 
 Sun Properties v. United States,
 
 220 F.2d 171, 174 (5th Cir. 1955) (“A tax avoidance motive must not be considered as evidence that a transaction is something different from what it purports to be.”);
 
 Woolley Equipment v. United States,
 
 268 F.Supp. at 364 (“the fact the parties might enter into a transaction for the purpose of minimizing or avoiding taxes which might otherwise accrue does not of itself make a transaction something different from what it purports to be.” (Citation omitted)).
 

 We conclude that the purchase oí the notes in this case was for a bona fide tax purpose. At trial, Biehl testified to the tax plus profit purpose of Machinery Rental, a company in the business of renting machinery which was seeking to purchase machinery to rent.
 
 [13]
 
 Although counsel for
 
 *724
 
 Citibank on cross examination did question Biehl’s motivation in the plan to purchase, the conflicting testimony was insufficient to overcome the Master’s findings which impliedly accepted Biehl’s testimony.
 

 Moreover, Machinery Rental made the offer to the trustee in writing, by way of a three page letter, suggestive of a serious and carefully planned intention to extend an offer. Cf. J. Calamari & J. Perillo, The Law of Contracts § 282 at p. 442 (1970) (“the required formality of a writing ‘promotes deliberation, seriousness, and shows that the act was a genuine act of volition.’ ” (citation omitted)). And in order to keep the offer open, Machinery Rental paid over to the trustee a nonrefundable fee of $50,000 which, in fact, was never returned to Machinery Rental or Biehl.
 
 [14]
 

 Some of the statements by the District Court are perhaps misleading. According to the District Court, Multiponics could not have obtained the loans without Biehl’s guarantee. While there was some evidence that Multiponics did not provide full reports to Chase on the farm properties, the fact is that the Chase loan was initially made without any guarantee by Biehl at all. It was only one year later, when Multiponics sought to roll-over the loan, that guarantees were required. Moreover, Biehl was not the sole guarantor — guarantees were also required from other directors. Hence, it seems to us that for the District Court to characterize Biehl as the beneficial creditor was just as “implausible” and “speculative,” if not more so, than the Master’s acceptance, after evidence was so presented, of the separate identities of Biehl and Machinery Rental.
 

 The District Court also states that by the time Machinery Rental purchased the notes in April, “negotiations had floundered and the trustee had rejected Machinery Rental’s offer.” 436 F.Supp. at 1071. This is not accurate. Rather, the record reveals that negotiations for the purchase continued through the middle of that summer and the trustee did not reject the offer by Machinery Rental until later, still. Further, the District Court stressed parts of Biehl’s testimony in which Biehl spoke of himself and Machinery Rental interchangeably, supposedly demonstrating his “misconception” of the fluidity of interest. 436 F.Supp. at 1071. The record reveals that it was counsel for the bankruptcy trustee who initiated such loose language. Counsel for Machinery Rental repeatedly objected to this questioning and requested more precise distinction of Biehl and Machinery Rental. It was the Master who then permitted the mixing of identities. Indeed, his very reason was that since Biehl only controlled one corporation involved in the case, there could be no misunderstanding of what Biehl really meant!
 

 In addition, we must remember that the alter ego doctrine and piercing of the corporate veil are truly exceptional doc
 
 *725
 
 trines, reserved for those cases where the officers, directors or stockholders utilized the corporate entity as a sham to perpetuate a fraud, to shun personal liability, or to encompass other truly unique situations. Herzog & Zweibel, 15 Vand.L.Rev. at 111 (“the modern tendency is to respect the corporate entity unless the notion of legal entity is used to justify wrong, protect fraud, or defend crime, or unless there is a ‘violation of the rules of fair play and good conscience by the claimant.’ ” (Footnote omitted)). Besides exceptional circumstances, the alter ego doctrine has been employed primarily to subordinate the debt due to a parent corporation, affiliated corporation or controlling stockholders
 
 from the bankrupt corporation itself.
 
 See
 
 id.
 
 at 102-12. Here, however, it is not Machinery Rental’s relationship to Multiponics that is in question, but Machinery Rental’s relationship to Biehl. And, as the District Court itself recognized, the mere fact that Biehl owned 100% of the stock of Machinery Rental does not alone show an alter ego relationship.
 
 Fawcett v. Mo. Pacific Ry. Co.,
 
 242 F.Supp. 675 (W.D.La.),
 
 aff’d per curiam,
 
 347 F.2d 333 (5th Cir. 1955).
 

 Moreover, the status of claims is generally determined at the time of the filing of the bankruptcy petition.
 
 United States v. Marxen,
 
 307 U.S. 200, 59 S.Ct. 811, 83 L.Ed. 1222 (1939). Here, when the petition was filed, the Chase Manhattan Bank and the Deposit Guaranty National Bank held the status of preferred creditors.
 

 The District Court attempted to avoid the
 
 Marxen
 
 rule by finding that Biehl was the “true creditor” of Multiponics when the petition was filed. 436 F.Supp. at 1072. While there may be a situation justifying equitable subordination despite
 
 Marxen,
 
 since we do not agree with the District Court’s view of the facts, we need not speculate on this possibility, here.
 

 Moreover, under
 
 Marxen,
 
 if Machinery Rental had not purchased Biehl’s notes, the banks would have been prior to the debenture holders. Yet, were we to follow the District Court, we would place the debenture holders in a better position than if Machinery Rental had not purchased the notes. While we would not wish to engage in the same sort of hypothetical dream sequences as suggested below, we cannot ignore this additional impact of the District Court’s ruling, were we to let it stand.
 

 Finally, since we find no basis for overruling the Master’s rejection of equitable subordination of Machinery Rental, we decline to override the clear contractual subordination to which the parties themselves agreed. The Trust Indenture provided that all borrowers of “senior indebtedness” would be prior to the status of the debenture holders. “Senior indebtedness” includes, as the Master found, the bank loans, here. When Machinery Rental purchased the bank notes, Machinery Rental succeeded to the Bank’s preferred status by contract as well. See Herzog & Zweibel, 15 Vand.L. Rev. at 90-93. Along with the Master, we conclude that Machinery Rental was not the alter ego of Biehl and clear the way for their business, and ours, to begin anew.
 

 AFFIRMED IN PART; REVERSED IN PART.
 

 [1]
 

 . See
 
 First National City Bank v. Herpel (“Multiponics IT"),
 
 and
 
 Citibank v. Multiponics (“Multiponics IIT"),
 
 also decided this day.
 

 [2]
 

 . The following chart outlines the initial capitalization:
 

 Debt Assumed by Company Founder Founders Investment
 

 $[331,000] Carl Biehl $137,820
 

 140,000 Jeanne D. Burkley 23,454
 

 221,000 Stanley E. Burkley 5,560
 

 930,000 N. Leslie Carpenter 9,593
 

 301,000 William J. Casey 145,614
 

 391,000 Alfred J. Moran 122,236
 

 361,000 Betty W. Swinny 29,016
 

 30,000 Joseph S. Zuccaro (7,794)
 

 $2,705,000 $465,499
 

 [3]
 

 . See
 
 infra
 
 p. 713.
 

 [4]
 

 . See
 
 infra
 
 p. 721.
 

 [5]
 

 . Since the Master presented great detail in his Report and the District Court reiterated much of that detail, we present here only the salient facts necessary for our analysis but endorse those opinions insofar as they support our result. We commend those Courts in their generally thorough, able undertakings.
 

 [6]
 

 . An initial point of clarification is useful. Biehl argues that the Master’s decision was improperly based on hindsight. Biehl claims that the Master saw that Multiponics eventually went bankrupt so, reasoning backward in time, concluded that Multiponics must have been underfinanced from the very beginning. We disagree with this characterization of the Master’s decision and, instead, are convinced that the Master analyzed the case as would a reasonably prudent man under those circumstances at those very times.
 

 [7]
 

 . The Master considered two other transactions, the acquisition by Multiponics of stock of American Hydroponics Systems, Inc. and payments to Orbe, but, as the District Court explained, neither “cause of action” provided a basis for the subordination of Biehl’s claim. See
 
 Matter of Multiponics Inc.,
 
 436 F.Supp. at 1069 n.9.
 

 [8]
 

 . See generally Herzog & Zweibel, 15 Vand.L. Rev. at 93-98. The authors suggest that
 

 [T]he Court should make a factual determination as to whether the corporation has been provided with separate assets adequate to give it at least a reasonable business chance to carry out its asserted functions. There is, of course, no requirement in law or equity that stockholders must initially provide for unforeseen losses not ordinarily contemplated in the particular business. Capital in this context refers not to working capital, but to the amount of the stockholder’s investment, the paid-in capital.
 

 15 Vand.L.Rev. at 95 (footnotes omitted). See also
 
 In re Transystems, Inc.,
 
 569 F.2d at 1370 (test is one of economic substance, the factors include the original debt-equity ratio, the existence or non-existence of reasonable expectation of repayment, the motive determining the “loan” form of advance and whether outside investors would make such advances); Cohen, Shareholder Advances; Capital or Loans?, 52 Am. Bankruptcy L.J. 259 (1978) (analyzing the various criteria utilized by the Courts).
 

 While this Court has generally eschewed rigid quantitative tests, See
 
 In re Mobile Steel Co.,
 
 563 F.2d at 702-03, in the proper case such data might provide useful information. See
 
 In re Transystems, Inc.,
 
 569 F.2d 1364, 1370 (5th Cir. 1978). Here, the initial debt-equity ratio reaches nearly 6 to 1 ($2,705,000: $465,499) which is not so out of line that it would constitute flagrant undercapitalization. (Compare
 
 In re Mobile Steel Co., supra,
 
 in which the debt-equity ratio — as far as we can tell from the facts presented there — ranged from 6 or 7 to 1 (approximately $1,722,893: $250,000).) The statistic appears of little use in our case, however, because there is some dispute about the accounting methods and appraisals employed by the organizers of Multiponics both at the outset and during the business operations.
 

 [9]
 

 . Orbe’s testimony included the following:
 

 Q. Isn’t it true that you believe that the corporation was terribly under financed from its very inception?
 

 A. No.
 

 Q. I call your attention to Page 51 of a deposition taken in New York and ask you to read that page and see if that refreshes your memory.
 

 * * * * * *
 

 I will quote. “I notice from a prior reading of your first deposition given in this matter that it was your opinion that the debtor corporation was terribly under financed from its very inception." Is that a fair reading of the first deposition?
 

 A. Yes. And I still stand by that statement.
 

 Q. Then it was your opinion that the debtor corporation was terribly under financed from its very inception?
 

 A. That was August of 1968 to October 31, 1968. That’s what I meant by that statement. That’s what I meant by it. The company was never really financed at all until the closing of the unit holders.
 

 Q. That’s what you mean by that statement?
 

 A. Yes, sir.
 

 Tr. v. 83, pp. 41 — 42. Orbe testified in a similar fashion later on during the trial:
 

 Q. What was the initial capitalization plan for the company?
 

 A. That’s a question I can’t answer the way it’s phrased.
 

 Q. Well, how was the company initially capitalized?
 

 A. It wasn’t.
 

 Tr. v. 98, p. 69. This testimony — by the Company’s own financial analyst — speaks directly — and detrimentally — to the lack of adequate capitalization of the Company at the outset. The Master properly relied upon this evidence in reaching his result.
 

 [10]
 

 . Moran’s testimony included the following:
 

 Q. What was the financial condition of Ivanhoe Associates in January of 1968 when it was first formed?
 

 A. I don’t recall. They had a great many assets, and they had debts.
 

 Q. Do you recall answering that question previously [at a deposition]? * * * “Question: What was the general financial condition of the corporation in January [In your deposition you stated:] “Answer: It was in difficult condition.”
 

 Do you recall that testimony now?
 

 A. I think it is probably true now.
 

 Q. You wouldn’t disagree with that statement today?
 

 A. No.
 

 Q. Do you remember what the general financial condition of Ivanhoe Associates was in June of 1968 when the deal of Lisbon was firmed up?
 

 A. No, I don’t.
 

 Q. Continuing on page 31, line 25:
 

 
 *719
 
 “Question: What was its general financial condition in June of 1968? Answer: As I recall, it was still difficult.”
 

 Do you recall that?
 

 A. I could well have made the statement. Tr. v. 92, pp. 46-47. Moran continued:
 

 Q. When you said in 1972 in answer to these questions that it was in difficult condition, what did you mean by “difficult condition”?
 

 A. That’s a highly qualifiable question you are putting to me.
 

 * * * * * *
 

 Q. Isn’t it a fact that the corporation was always in debt because of lack of cash?
 

 A. Yes.
 

 Q. So you started off with a corporation that was in difficult condition, and it continued to be in difficult condition throughout; isn’t that right?
 

 A. That’s right. We were never able to get a public common stock issue off the ground. ******
 

 Q. Was it ever properly financed?
 

 A. It could not be for reasons you well know. The rules were changing on us at that time.
 

 Tr. v. 92, pp. 48-50.
 

 [11]
 

 . Further, Biehl completely ignores the alternative condition for subordination which we suggested in
 
 Mobile Steel.
 
 Even if credit or injury is not shown, unfair advantage to the claimant may suffice. Here, Biehl may not have profited financially from his insider status, and may even have sustained substantial losses. Yet, Biehl’s primary interest was not the proper operation of the Company but, as he put it, avoiding the situation where his “investment was down the drain.” For example, the Special Master found that Biehl and other founders, officers and directors knew or should have known that properties transferred to the Company at its start were appraised for substantially more than their acquisition costs. Similarly the Master found that the Board chose to issue debenture units rather than register common stock, thereby preventing the dilution of the equity held by Biehl and other principals. And, the Master characterized the circumstances and relationships between the directors as “suspicious” and not at arms’ length.
 

 [12]
 

 .
 
 Taylor v. Standard Gas and Electric Co.,
 
 306 U.S. at 310, 59 S.Ct. at 545, 83 L.Ed. at 670.
 

 [13]
 

 . Biehl testified that:
 

 Machinery Rental, Inc. is in the business of renting all types of machinery. They could have taken this over, rented to the trustee and it would have been the type of business which they are engaged in. Furthermore,
 
 *724
 
 there were certain tax advantages of Machinery Rental, Inc. if this deal would have been consummated.
 

 * * * * * *
 

 The machinery could have been taken over from the trustee at its book value and there would have been a depreciation allowance on that which would have helped the total tax picture of Machinery Rental.
 

 Tr. v. 101, pp. 21-22.
 

 [14]
 

 . The District Court admitted that a true tax purpose would be sufficient to justify the purchase of the notes but disbelieved the veracity of Machinery Rental’s tax motives here. While we acknowledge that some of the circumstances relating to the purchase were arguably suggestive of motives less than bona fide (e. g., the lack of the consummation of the sale and the purchase of the notes at full face value), the District Court substantially discounted or ignored other aspects of the purchase which we have discussed (and which the Master credited), giving rise to the inference of a true tax purpose.
 

 Indeed, Machinery Rental’s proposal may not only have been plausible, but may have made good business sense, since the bankruptcy trustee, two years later, successfully sold the machinery, as Machinery Rental said it intended to do, for a tidy sum of $900,000. While this fact was obviously not before the Master to consider, we note the ultimate disposition of the machines to underscore the very real possibility that Machinery Rental meant what it said it meant.